**NATIVE VILLAGE OF EKLUTNA,**
Appellant,

v.

**ALASKA RAILROAD CORPORATION**
and Municipality of Anchorage,
Appellees.

Municipality of Anchorage,
Cross–Appellant,

v.

Alaska Railroad Corporation,
Cross–Appellee.

Nos. S–10270, S–10279.

Supreme Court of Alaska.

March 12, 2004.

Rehearing Denied April 16, 2004.

Sara E. Heideman, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellant.

William S. Cummings, Ashburn & Mason, Anchorage, for Appellee/Cross–Appellee Alaska Railroad Corporation.

William W. Whitaker, Assistant Municipal Attorney, and William A. Green, Municipal Attorney, Anchorage, for Appellee/Cross–Appellant Municipality of Anchorage.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

This is the third appeal arising out of the Alaska Railroad Corporation's quarry operations on culturally significant land adjacent to the Native Village of Eklutna, which lies within the boundaries of the Municipality of Anchorage. Eklutna sought a preliminary injunction to enjoin the Railroad from blasting and all other quarry activities, arguing that the Railroad does not have a conditional use permit to operate a gravel pit in that area as Anchorage Municipal Code (AMC) 21.40.240(D)(4) requires. The Municipality of Anchorage intervened as a plaintiff. The trial court denied Eklutna the preliminary injunction and entered judgment as a matter of law in favor of the Railroad, concluding that the Railroad is not subject to local planning and zoning ordinances. Eklutna and the Municipality of Anchorage appeal. Because the legislature did not clearly express its intent to exempt the Railroad from local zoning laws, we reverse and remand.

## II. FACTS AND PROCEEDINGS

### A. Factual History

#### 1. Cultural significance and history of the Eklutna quarry site

The quarry is located on one of two hills, or "knobs," adjacent to Eklutna. Dr. James Fall, a cultural anthropologist, prepared a report for the Railroad that explained the Eklutna quarry site's significance as the source of the village's name:

> The Dena'ina name for the village [of Eklutna] is "Idlughet," "The Place by the Plural Objects".... The "plural objects" referenced in these place names are the two hills, or to use the term used by many Eklutna residents today, the "knobs," located between the village and Knik Arm, just north and east of the community.

For purposes of this appeal, the parties agree that Eklutna considers the knobs within the quarry property to be culturally significant.

The Alaska Railroad, at the time owned by the United States government, owned and operated the Eklutna quarry from an undetermined date in the 1940s until 1985.[1] In 1985, under the Alaska Railroad Transfer Act of 1982, the Railroad was turned over to the State of Alaska, which operated it through the then newly created Alaska Railroad Corporation.[2] In 1987 Eklutna, Inc. and the Alaska Railroad Corporation entered into an agreement settling their respective claims over property under the Alaska Native Claims Settlement Act[3] and under the Alaska Railroad Transfer Act.[4] Under that agreement, the Alaska Railroad Corporation was granted the land containing the quarry until it ceases to use the land "in connection with furnishing mass or bulk transportation," at which time the land is to be conveyed to Eklutna.

#### 2. Previous proceedings regarding the Eklutna quarry

The larger of the two Eklutna knobs has been the subject of two previous appeals before this court. In July 1995 the National Bank of Alaska, which owned part of the quarry operated by the Railroad, filed an application for a conditional use permit to conduct a granite mining operation there.[5] The Municipality of Anchorage's Planning

---

1. *Alaska R.R. Corp. v. Native Vill. of Eklutna*, 43 P.3d 588, 590 (Alaska 2002).

2. 45 U.S.C. §§ 1201–1214 (1982).

3. 43 U.S.C. §§ 1601–1629 (1971).

4. 45 U.S.C. §§ 1201–1214 (1982).

5. *Native Vill. of Eklutna v. Bd. of Adjustment*, 995 P.2d 641, 642 (Alaska 2000).

and Zoning Commission approved the conditional use permit, and the Anchorage Board of Adjustment and the superior court affirmed this decision.[6] We reversed and remanded in 2000, concluding that "the Board's finding that 'no cultural resources will be adversely affected' was unsupported by substantial evidence in light of the whole record." [7]

The second case, *Alaska Railroad Corp. v. Native Village of Eklutna*, arose after the Railroad entered into a licensing agreement in 1995 granting Damco Paving Corporation the exclusive use of the quarry for commercial quarrying operations in exchange for the Railroad receiving royalty payments for the rock quarried.[8] In 1997 Eklutna filed suit to enjoin Damco's quarrying operations, alleging that the quarry was a nonconforming use of the land and that neither the Railroad nor Damco had sought a conditional use permit to proceed with the commercial quarrying operation.[9] In May 1999 the superior court granted judgment in favor of Eklutna, requiring Damco to obtain a conditional use permit before it could continue with quarrying operations.[10] We affirmed in February 2002.[11] Not addressed in that decision was the question now before us: whether the Railroad enjoys sovereign immunity from local zoning laws in its own operation of the quarry.

### 3. Quarry operations in recent years

After the superior court entered its decision in *Alaska Railroad Corp.* in May 1999,[12] the Railroad resumed direct operation of the quarry. The Railroad began removing rock and other materials from the quarry in May or June 2000, and it blasted in the quarry on July 26, 2000.

On January 12, 2001, the Railroad notified Eklutna that "no operations or blasting would occur at the site until March, 2001."

However, at a January 19, 2001 meeting, the Railroad informed Eklutna that blasting would occur on January 26, 2001.

### B. Procedural History

On January 22, 2001, Eklutna filed a complaint and motion for preliminary injunction to stop the blasting. Following expedited briefing, an evidentiary hearing, and oral argument, the trial court denied Eklutna's request for a preliminary injunction. Although the trial court recognized that "[t]hese hills are vital cultural resources for the Village inhabitants and the Denaina Athabascan Indians as a people," it concluded that the municipal ordinance could not prevent the Railroad's quarry operation and entered final judgment in favor of the Railroad as a matter of law, because "the legislature intended that [the Railroad] not be subject to local planning and zoning ordinances."

On March 1, 2001, the Municipality of Anchorage moved to intervene in the litigation in order to seek declaratory relief endorsing its position that the Railroad must comply with municipal zoning. The superior court set aside its judgment while it considered the Municipality's motion. After granting the motion to intervene and reviewing supplemental briefing by the parties, the court reinstated its previous final judgment. Eklutna appealed the judgment and the Municipality filed a cross-appeal against the Railroad.

## III. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment de novo.[13] To obtain summary judgment, the moving party must prove the absence of a genuine factual dispute and its entitlement to judgment as a matter of law.[14]

---

6. *Id.* at 643.

7. *Id.* at 645.

8. 43 P.3d 588, 590 (Alaska 2002).

9. *Id.*

10. *Id.* at 589.

11. *Id.* at 592–95.

12. *Id.* at 590.

13. *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999).

14. *Id.*

All reasonable inferences of fact must be drawn in favor of the nonmoving party.[15] Because this appeal presents an issue of first impression before this court, we adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[16]

### B. The Railroad Is Not Immune from Local Zoning Laws.

The Railroad maintains that it is not subject to the Municipality of Anchorage's zoning ordinance, which would require it to obtain a conditional use permit before operating the quarry. It argues that the Alaska Railroad Corporation Act[17] (ARCA) and its legislative history show that the legislature intended the Railroad to be immune from such laws. It further argues that even if ARCA does not evidence express legislative intent to immunize the Railroad, Alaska law presumes that the legislature intends state instrumentalities to be immune from local zoning in the absence of a legislative statement to the contrary. Eklutna and the Municipality (collectively "Eklutna") maintain that because there is no clear and express provision in the statute regarding whether the Railroad is immune from local land use regulation, a balancing of interests test should apply to determine the legislature's intent.

■ We hold that ARCA provides no clear indication of the legislature's intent with regard to local land use authority over the Railroad and that Alaska law does not presume state immunity to local zoning. Left with unclear indications of intent and no presumption of immunity, we turn to a balancing of interests test to determine whether the legislature intended to subject the Railroad to local zoning ordinances.

### 1. No provision of the Alaska Railroad Corporation act clearly indicates legislative intent to exempt the Railroad from local zoning.

At the outset, it is important to note that ARCA created a state entity with a unique combination of private and public powers and immunities. Although it is "an instrumentality of the state," [18] the Railroad is not part of the Department of Transportation and Public Facilities (DOTPF) and is not subject to certain financial and procedural requirements to which other state agencies are subject, such as the State Procurement Code, the Fiscal Procedures Act, and the Executive Budget Act.[19] With the Railroad's unique status within the state government in mind, we examine several provisions of ARCA to determine whether the legislature intended to immunize it from local zoning.

#### a. Alaska Statute 42.40.920(b)

Alaska Statute 42.40.920(b) lists statutes from which the Railroad is exempt. It provides:

> (b) Unless specifically provided otherwise in this chapter, the following laws do not apply to the operations of the corporation:
>
> . . . .
>
> (3) AS 35 . . . .

Title 35 of the Alaska Statutes is entitled "Public Buildings, Works, and Improvements" and authorizes DOTPF to construct almost all public works in the state.[20] Alaska Statute 35.30.020 provides: "A department shall comply with local planning and zoning ordinances and other regulations in the same manner and to the same extent as other landowners." In AS 35.95.100(3), "department" is defined as DOTPF "unless the context requires otherwise." Other sections of Title 35 refer to "the department"; this section's shift to "*a* department" (emphasis added) implies that it subjects any department to local zoning.[21] If AS 35.30.020 applied to

---

15. *McGlothlin v. Municipality of Anchorage,* 991 P.2d 1273, 1277 (Alaska 1999).

16. *Taranto v. North Slope Borough,* 992 P.2d 1111, 1113 (Alaska 1999).

17. AS 42.40.010 et seq.

18. AS 42.40.010.

19. *See* AS 42.40.920(b)(4)-(6).

20. *See* AS 35.05.010.

21. *But see Rabbit Creek Shooting Range Improvement,* 1981 Informal Op. Att'y Gen. 867, 867–68; 1981 WL 38706, at *1 (Alaska, July 13, 1981).

the Railroad, then the Railroad would be subject to local zoning. The Railroad argues that the converse must be true: by releasing it from AS 35.30.020, the Railroad claims, ARCA indicates legislative intent to immunize it from such authority. This argument assumes that in the absence of AS 35.30.020, the Railroad would be immune to local zoning. As discussed in Part III.B.2 below, that assumption is faulty. The provision exempting the Railroad from Title 35 shows only the legislature's desire that the Railroad not be treated as a subdivision of DOTPF and that DOTPF not control construction of Railroad projects. ARCA's legislative history supports this reading.[22]

### b. Alaska Statute 42.40.930

Alaska Statute 42.40.930 provides: "If provisions of this chapter conflict with the provisions of other state law, the provisions of this chapter prevail." The Railroad argues that this statute "preempts the application of local zoning." But this provision describing how to sort out conflicts among state laws gives us no insight into the relationship between the state law creating the Railroad and local ordinances that may apply to it.

### c. Alaska Statute 42.40.935

Alaska Statute 42.40.935, entitled "Railroad facilities code compliance," provides that within two years after the date of transfer, the Railroad "shall develop and adopt a plan to achieve compliance with," among other laws, "building and related safety codes applicable to facilities of the [Railroad]."[23] The Railroad employs the canon *expressio unius est exclusio alterius* to argue that this provision implies that the legislature intended immunity for the Railroad. The statute's express application of certain local regulations, the Railroad argues, implies that other local regulations, omitted from mention, do not apply. At the heart of the Railroad's argument is an interpretation of AS 42.40.935

subjecting the Railroad to local safety and building regulations. The words of the statute show that this reading is faulty. For the statute to do what the Railroad claims, it would need another clause, stating explicitly that local safety codes govern the Railroad. Instead, it assumes the existence of "codes applicable to the facilities of the [Railroad]." The effect of the statute is to lay out a procedure for compliance with codes whose authority pre-exists the provision, not to subject the Railroad to that authority. This section of the statute does not list the local ordinances to which the Railroad is subject, so *expressio unius* does not apply and the fact that zoning is not mentioned sheds no light on whether the legislature intended to immunize the Railroad.

The assumption that the Railroad is not the exclusive authority on its property is reflected in at least one other section of ARCA. The section laying out the Railroad's general powers, AS 42.40.250, grants the Railroad authority to "maintain a security force to enforce municipal ordinances ... with respect to violations that occur on or to" Railroad property. This section similarly takes no action to require that municipal ordinances apply on Railroad property, instead starting from the assumption that they do. This bolsters the claim that the Railroad is subject to zoning—if the legislature assumed that local safety and building regulations apply, it is a fair inference that it also assumed that land use regulations apply.

### d. Alaska Statute 42.40.390

Alaska Statute 42.40.390, entitled "Land Use Rules," provides:

> The board [of the Alaska Railroad Corporation] may adopt exclusive rules governing land use by parties having interests in or permits for land owned or managed by the corporation. The power conferred by this section is exercised for the common

---

**22.** *See First Reading of HB 512 before the House Transp. Standing Committee* at 0275 (Alaska, May 13, 1984) (statement of Mark Hickey) (describing steps taken by drafters to ensure that Railroad was free of DOTPF oversight); *House Transp. Standing Comm. meeting on HB 512* at 0145 (Alaska, Feb. 22, 1984) (statement of Chairwoman Representative Cato) ("[T]he senate ...

[was] told they would have to put [the Railroad] under one of the departments. They chose the Department of Commerce and Economic Development as they felt that was where it belonged rather than under DOT/PF.").

**23.** AS 42.40.935(b).

health, safety, and welfare of the public and to the extent constitutionally permissible, may not be limited by the terms and conditions of leases, contracts, or other transactions.

The Railroad argues that "[t]his grant of power to the ARRC's board to adopt 'exclusive rules governing land use' by its lessees and permittees would be rendered ineffective if the [Railroad] was also subject to possibly conflicting zoning ordinances in each of the municipalities in which it operates."

This provision presents some evidence that the legislature intended to exempt the Railroad from local zoning laws. Its reference to "exclusive rules" might indicate that no other government's rules would apply on Railroad land. But the term "exclusive" could also be read as a choice-of-law provision—if the Railroad Board promulgated rules conflicting with local ordinances, the Railroad's regulations would govern, but in the absence of a conflict, local rules are unaffected.[24]

An examination of the provision's legislative history shows that it should not be read as a clear declaration that the legislature intended to shield the Railroad from local land use regulation. At a Senate Transportation Committee hearing on the Railroad bill, Tamara Cook, a lawyer from the Legislative Affairs Agency, asked the committee whether the provision was meant to supersede municipal land use regulation.[25] Senator Moss, the committee chairman, replied that it was not.[26] Dave Walsh, a member of the Alaska Railroad Transfer Team, said,

without contradiction from any legislator or witness, that he did not think "this section ... allows the railroad to ignore local law."[27] In a memorandum the next month, Cook again pointed out that the statutory language might be read to immunize the Railroad; the memo suggested that if the provision was meant to provide this immunity, it ought to be clarified.[28] At a hearing following the memo, committee member Senator Halford declared that he thought the statute should protect "[R]ailroad operations" from local regulation.[29] He asserted that the provision as it was worded would do so.[30] Senator Gilman agreed that local zoning authority would be problematic, but nevertheless moved to delete AS 42.40.390.[31] Although he acknowledged Senator Halford's concern, he argued the provision should be deleted because it was originally added to ensure that Railroad bonds would be tax exempt under a federal law. The law had recently been changed to explicitly give the Railroad tax-exempt status, regardless of whether it had land-use authority, so the section was no longer necessary.[32] A third senator then noted that the Railroad's status as a tax-exempt bonding authority was again in question, and the provision was restored in response.[33] The record of the meeting reflects no further discussion of local zoning authority.

This series of events suggests that AS 42.40.390 should not be read as clearly granting the Railroad immunity from zoning ordinances. Most importantly, different members of the responsible committee, on

---

24. The Railroad Board has not promulgated any such regulation. Contrary to the dissent's assertion (dissent at 63 n. 12) a choice-of-law rule does not grant any immunity or authority, but only resolves conflicts between laws.

25. *Hearing on SJR 43 and SB 352 Before the Senate Transp. Standing Comm.* (Alaska, Feb. 22, 1984) (statement of Tamara Cook, Deputy Director of the Division of Legal Services, Legislative Affairs Agency).

26. *Id.* (statement of Senator Moss).

27. *Id.* (statement of Dave Walsh).

28. Memorandum from Tamara Cook, Deputy Director of the Division of Legal Services, Legislative Affairs Agency to Senator Moss, Chairman, Senate Transp. Comm. 2 (March 12, 1984) ("If

... the purpose of the section is to exclude rail property from municipal land use regulation, that should be done specifically. I would recommend that the section be clarified or eliminated.").

29. *Hearing on SB 352 Before the Senate Transp. Standing Comm.* (Alaska, March 15, 1984) (statement of Senator Halford).

30. *Id.*

31. *Id.* (statement of Senator Gilman).

32. *Id.*

33. *Id.* at 307, 321 (statement of Senator Faiks, motion of Senator Gilman).

separate occasions, denied that the provision was intended as a shield against local regulation—once by an explicit denial and once by assigning an entirely different purpose to the section. The possible immunizing effect was brought to the committee's attention, and one of its members expressed an interest in providing such protection. The committee had before it explicit advice from Legislative Affairs on how to address that concern and ensure immunity. It chose not to take action. It is often an error to make much of legislative inaction,[34] but in this context, with the problem and solution plainly before it, we see the legislature's decision as at least suggesting that AS 42.40.390 was not intended as a shield against local regulation. Senator Halford's view of the provision indicates that he did intend such an exemption, but we cannot say the rest of the committee, let alone the legislature, agreed with him. Whatever it does stand for, AS 42.40.390 is not a clear indication of legislative intent to exempt the Railroad from local zoning.

### e. Alaska Statute 42.40.250(13)

The dissenting opinion also enlists AS 42.40.250(13), which authorizes the Railroad to "apply to the state, the United States, and foreign countries or other proper agencies for the permits" required for its operation.[35] The list does not include "municipalities" or "political subdivisions" of the state, as the dissent points out, but other sections of ARCA do, and a former, unenacted version of ARCA was amended to drop inclusion of municipalities. The dissent concludes that the legislature must have intended that the Railroad should not have to obtain permits from local authorities. This logic has two essential flaws. First, it ignores the words "or other proper agencies," which clearly includes municipalities, regardless of whether they were explicitly mentioned in other sec-

tions of the statute. Second, it relies on changes made to a version of the act that failed to pass. The legislature rejected the bill that had been amended to drop the requirement of compliance with municipal regulations. We cannot give that amendment any weight in our inquiry.[36] If anything, we might imply from this history that the legislature was opposed to the exemption, since it turned down the bill that included it.

### 2. The legislature did not create the Alaska Railroad relying on a presumption that state instrumentalities are immune from local zoning.

The legislature did not express in ARCA a clear intent to immunize the Railroad from local zoning regulations; nor is there anywhere in the legislation a clear expression that the Railroad is to be subject to them. We must therefore decide how to determine the legislature's intent in order to fill that statutory gap. The Railroad argues that "Alaska first adopted its statutory scheme governing relations between the State and localities" at a time when the black-letter rule was that states and state agencies were exempt from municipal zoning in the absence of express statutory language to the contrary. This presumption, it argues, answers the question left unresolved by ARCA; because there is no clear statement that local zoning applies to the Railroad, the legislature must have intended that it does not.

The Railroad points to the fact that in Alaska "there are no statutes expressly stating that a state agency is not subject to local zoning, but there are at least two that expressly provide for compliance with local zoning." As examples of statutes in which the Alaska Legislature rejected any presumption of immunity, the Railroad cites AS

---

**34.** *See Cmty. For Creative Non–Violence v. Reid,* 490 U.S. 730, 749, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("Ordinarily, Congress' silence is just that—silence.").

**35.** Dissent at 64–65.

**36.** *Cf. Westlands Water Dist. v. Natural Res. Def. Council,* 43 F.3d 457, 462 (9th Cir.1994) (refusing to "transfer[ ]" legislative history from one

bill to another); *Troy Gold Industries, Ltd. v. Occupational Safety & Health Appeals Bd.,* 187 Cal.App.3d 379, 231 Cal.Rptr. 861, 868 n. 6 (1986) ("[A] single unenacted bill . . . is meaningless as an expression of legislative intent as are statements of the individual legislators in favor of the rejected bill."); 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTR. § 48:01, at 411 (6th ed. 2000) ("[S]tatements made by persons in favor of a rejected or failed bill are meaningless. . . .").

18.55.100(a)(7) [37] AS 40.15.200,[38] AS 35.30.020,[39] and AS 22.05.025(a)(2) [40]—all of which expressly require an agency (or several) to comply with local zoning laws. These statutes, the Railroad argues, reflect a baseline presumption that state instrumentalities are immune from local zoning. Without such a presumption, state instrumentalities would be subject to local authority with no legislative action, and these statutes would be superfluous.

 The presumption of immunity the Railroad seeks is a form of the state's sovereign immunity. When a party invokes a background rule granting it immunity, stated by neither the courts nor the legislature of Alaska, it would do well to confront how to square that rule with this court's unambiguous summation of the common law of sovereign immunity: "liability is the rule, immunity the exception." [41] Although liability for negligence is not at issue here, the principle behind our presumption of liability retains its force: The state is responsible for its actions to the same degree as a private party, and those, like the Railroad, who propose a rule weakening its responsibility have a heavy burden to carry. And by abolishing the state's common law immunity to suits sounding in contract, quasi-contract, or tort, the legislature has shown complementary disfavor for sovereign immunity.[42]

 That said, there is no doubt that the Railroad and the dissent are correct that under the "traditional" rule, the state and its instrumentalities would be presumed immune from local regulation. But this rule is contrary to our general precept of state liability. There are exceptions to our principle—for example, as discussed below, the state is presumed immune from punitive damages awards [43]—but neither the Railroad nor the dissent has made the strong showing necessary to demonstrate that Alaska operates under a rule presuming immunity. The history of enactments dealing with the relationship between state and local authorities, as ably recounted in the dissenting opinion, does make a plausible argument that the legislature at one time operated from that presumption. There is another plausible reading, however.

The legislature has in the past enacted legislation that restates an underlying presumption. We recognized as much in *Alaska Housing Finance Corp. v. Salvucci*, where we noted that the legislature had "specifically exclude[d] awards of punitive damages against the State" from AS 09.50.280, part of Alaska's Tort Claims Act,[44] but we were not dissuaded from finding that "a presumption exists ... which disfavors punitive damage

---

37. "[T]he [Alaska Housing Financing C]orporation has all powers necessary to ... provide, *subject to the applicable planning, zoning, sanitary, and building laws, ordinances, and regulations* for the construction, improvement, alteration, or repair of a housing or public building project...." AS 18.55.100(a)(7) (emphasis added).

38. "All subdivisions of land made by the state, its agencies, instrumentalities, and political subdivisions are subject to ... home rule ordinances or regulations governing subdivisions, and shall comply with ordinances and other local regulations ... in the same manner and to the same extent as subdivisions made by other landowners." AS 40.15.200.

39. "A department shall comply with local planning and zoning ordinances and other regulations in the same manner and to the same extent as other landowners." AS 35.30.020.

40. "[I]n the exercise of its authority [to construct court facilities], the supreme court shall cooperate and coordinate with the Department of Transportation and Public Facilities so that court facility construction projects are carried out in accordance with the statutes and regulations applicable to state public works projects." AS 22.05.025(a)(2).

41. *Adams v. State*, 555 P.2d 235, 244 (Alaska 1976); *see also Johnson v. Alaska State Dept. of Fish & Game*, 836 P.2d 896, 905 (Alaska 1991); *Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985).

42. AS 09.50.250; *see also Estate of Arrowwood By and Through Loeb v. State*, 894 P.2d 642, 644 (Alaska 1995). Immunity is retained for certain types of suits, including those arising from "a discretionary function or duty" of the state. AS 09.50.250(1–5); *see also, e.g., Estate of Himsel v. State*, 36 P.3d 35, 40 (Alaska 2001).

43. *Alaska Housing Finance Corp. v. Salvucci*, 950 P.2d 1116, 1123 (Alaska 1997).

44. 950 P.2d at 1123.

awards against the State." [45] The presumption means that the state was not subject to punitive damages awards even before the law was passed. The law did not change anything; yet the legislature passed it anyway. But the dissent argues that here we must find that the legislature's enactments changed the situation—we must read from the enactments that the legal landscape was different before they were passed. By the dissent's reasoning in this case, the Tort Claims Act should have been evidence against the presumption of state immunity that we affirmed in *Salvucci*. We did not employ that logic then, and we will not employ it now. The legislature may well have passed laws subjecting state entities to local regulation even though those entities were already obliged to follow local authority.

But more fundamentally, the dissent misapprehends the point of our inquiry. We are seeking to interpret the effect of a gap in ARCA in order to determine whether the Railroad must comply with local zoning ordinances. Our task, therefore, is to pinpoint the intent of the legislature that enacted ARCA in 1984, not to map the understanding of the Alaska Legislature as a historical body, especially in light of the changing complexion of the law of state-local relations. Only one legislature enacted ARCA; only that legislature's intent is of concern today.

■ Although it is not determinative, the Alaska Constitution provides some guidance. Article X, section 11 assigns to the state's home rule municipalities "all legislative powers not prohibited by law or by charter." This provision is not a bar to the presumption of immunity sought by the Railroad— leaving state instrumentalities immune to lo-

cal regulation does not strip them of a constitutionally guaranteed power. But we should recall what motivated the framers to include this provision: "It was hoped that the constitutional delegation of authority under the terms of Art. X, § 11 would lead the courts of this jurisdiction to take a new and independent approach when conflicts inevitably arose between the municipalities and the state." [46] "[T]his constitutional provision was adopted in order to abrogate traditional restrictions on the exercise of local legislative authority." [47] This court is certainly not bound by some other jurisdictions' rule that state instrumentalities are always immune absent explicit waiver by the legislature. And in light of our constitutional commitment to questioning long-held ideas about the interacting powers of state and local governments, we should hesitate to assign to the legislature the failure to rethink the role of municipalities.

■ With that constitutional directive in mind, we note that by 1984, when the legislature created the Railroad as an arm of the state, support for the traditional presumption of immunity was starting to erode. In 1972 the Supreme Court of New Jersey, in *Rutgers, the State University v. Piluso*,[48] held that the particular intent of the legislature in passing the law in question was paramount. The court therefore discarded the traditional presumption. Under its new rule, when the legislature is silent or unclear, instead of presuming that it intended immunity, courts are to balance the interests at stake in order to determine the legislature's intent.[49] By 1982, the number of states adopting the test was approaching ten.[50] The high court in at least one other state had hinted it might do so,[51] and the American Law Institute had

**45.** *Id.*

**46.** *Jefferson v. State*, 527 P.2d 37, 42–43 (Alaska 1974); *see also Area Dispatch, Inc. v. City of Anchorage*, 544 P.2d 1024, 1025–27 (Alaska 1976).

**47.** *Simpson v. Municipality of Anchorage*, 635 P.2d 1197, 1200 (Alaska App.1981).

**48.** 60 N.J. 142, 286 A.2d 697 (1972).

**49.** *Id.* at 702–03. The specific factors to be considered are discussed below in Part III.B.3.

**50.** In *Blackstone Park Improvement Ass'n v. State Bd. of Standards & Appeals*, 448 A.2d 1233, 1239 (R.I.1982), the Rhode Island Supreme Court counted nine states adopting the test, and added itself as the tenth. Our review of the cases, however, indicates that several had only adopted part of the test or had only indicated in dicta that the test might be the right one.

**51.** *Kunimoto v. Kawakami*, 56 Haw. 582, 545 P.2d 684, 687 (1976).

adopted it for its Model Land Development Code.[52] A few years later one state court described the traditional presumption as "both simplistic and archaic."[53] The traditional approach changed because government had changed:

> The old tests were adopted at a time when state government was much smaller. The myriad of agencies now conducting the functions of the state have necessarily resulted in a diminution of centralized control. The decision of a person administering an outlying function of a state agency with respect to the site where this function should be performed is not necessarily any better than the decision of the local authorities on the subject of land use.[54]

As shown by ARCA's creation of a state-owned Railroad, governed by a board some distance from the center of state government,[55] Alaska was as much a part of this trend as any other state.

There is no particular evidence that the legislature was aware of this development in other states' law, and we do not claim that it enacted ARCA with the new test in mind. However, an examination of enactments and other legislative statements provides evidence that like the courts adopting the balancing test, the legislature at the time of ARCA was taking notice of the need for a new balance between state and local governments and loosening its adherence to the traditional rule. First, there is a section of ARCA itself, AS 42.40.935(b), discussed in Part III.B.1.c above, which indicates that the legislature that enacted ARCA may not have been operating from a presumption of immunity. This provision requires the Railroad to consult with local authorities and gives it five years to develop a plan for compliance with

safety and building codes. These apply to other state instrumentalities through AS 35.10.025, but the Railroad is exempt from AS 35. Because AS 42.40.935(b) itself does not contain any language applying the codes to the Railroad, the provision appears to start from the assumption that they do apply. Reading the statutes this way admittedly might have the effect of rendering AS 35.10.025 superfluous—if the 1984 legislature assumed that local codes apply to state instrumentalities, the provision requiring such compliance is unnecessary. It is, however, not surprising that if the legislature's views change over time, some older provisions like AS 35.10.025, enacted in 1969,[56] might be overtaken by changes in its perspective.

The dissent's own reading of the ARCA legislative history further illustrates that the 1984 legislature may have abandoned any older presumption about immunity. As the dissent recounts the March 15, 1984 Senate Transportation Standing Committee meeting, Senator Halford sought to preserve AS 42.40.390 in order to "protect the railroad's operations from local zoning restrictions."[57] While we differ with the dissent on the meaning of the committee's response to Senator Halford's remark, the nature of his concern is unmistakable: he thought that the Railroad should be shielded from local zoning, and he thought that the statutory provision was necessary to give it that protection. If he thought that the Railroad was presumptively immune from zoning, he would not have argued for the inclusion of AS 42.40.390 on those grounds.

Finally, the most recent piece of legislation that the dissent cites as "central to [its] main premise"[58] is the 1976 amendment to AS 35.10.020, including the University of Alaska

---

**52.** *See* Model Land Dev.Code §§ 7–301 to 304 and 12–201 (1975).

**53.** *Hayward v. Gaston*, 542 A.2d 760, 766 (Del. 1988) ("We find that the [superior sovereign] hierarchical approach to land use disputes between competing governmental entities, as urged by the Department, is both simplistic and archaic.").

**54.** *Blackstone Park Improvement Ass'n*, 448 A.2d at 1237–38 (quoting *City of Temple Terrace v. Hillsborough Association for Retarded Citizens,*

*Inc.*, 322 So.2d 571, 578–79 (Fla. 2d DCA 1975), *aff'd*, 332 So.2d 610 (Fla.1976)).

**55.** *See* AS 42.40.020 (setting out makeup of Railroad's Board of Directors).

**56.** Ch. 89, § 1, SLA 1968.

**57.** *Hearing on SB 352 Before the Senate Transp. Standing Comm.* (Alaska, March 15, 1984) (statement of Senator Halford).

**58.** *See* dissent at 62.

in its coverage. The dissent says this change "illustrates legislative acceptance of the rule of general immunity" [59] because the amendment shows that "[t]he legislature implicitly accepted the University's view that it was not subject to zoning." [60] But all the amendment shows is that the legislature wanted the University to comply with local rules, and the University was not doing so. The legislative history cited in the dissent [61] suggests that the legislature believed that the University was always subject to local zoning. The amendment's sponsor, Senator Croft, noted that the legislature, upon passing the original bill, had realized that "the University considers itself something other than a portion of the state." [62] He went to say that he thought that the University should abide by the bill, and had he known "that they wouldn't, [the Senate] would have included it last year." [63] The real purpose of the 1976 amendment may well not have been to strip any preexisting immunity from the University, but to clarify that it did not have immunity and ensure that the University abandon its position that it did. This is not to argue that the legislature actually did believe that the University was never immune, but merely to point out that the evidence of the legislature's adherence to a presumption of immunity grows weaker as the date moves closer to 1984. By the time of the enactment of ARCA, the picture is quite murky—too murky to convince us to throw over the legislature's disfavor for immunity and say that the legislature acted against the background of the traditional presumption.

### 3. The trial court must apply the balancing of interests test if the Railroad's efforts to comply with local zoning laws fail.

Because the legislature did not state explicitly whether it intended the Railroad to be immune and because we do not find sufficient evidence to impute to it the intent to rely on a presumption of immunity, we must adopt a test to discern the legislature's intent. We have never addressed the issue and there is no consensus among other jurisdictions regarding what test should be applied to determine whether the legislature intended a state agency to be immune from local zoning ordinances. [64] In the absence of a clear expression by the legislature of its intent, there are four tests generally used by courts to resolve intergovernmental land use disputes: the "superior sovereign test," the "eminent domain test," the "governmental function test," and the "balancing of interests test." [65]

The superior sovereign test, the source of the traditional presumption of immunity, focuses on the relationship between the competing political entities. If the agency whose activities might be regulated is "superior" to the regulating authority, it is presumed that the legislature intended the superior agency to be immune from regulation. [66] Where two governmental entities are of equal rank, the

---

**59.** Dissent at 63.

**60.** Dissent at 61.

**61.** Dissent at 60 n. 5.

**62.** Track 1, 16:00–19:20—1976 Senate Committee: Community & Regional Affairs.

**63.** *Id.; see also* Track 2, 0:27–4:00—House Committee: Community & Regional Affairs (statement of Senator Croft) ("[W]e thought we were picking up the University but there was a drafting mistake.").

**64.** *See generally* Elaine Marie Tomko–DeLuca, Annotation, *Applicability of Zoning Regulations to Governmental Projects or Activities,* 53 A.L.R. 5TH 1 (1997) (surveying tests in various jurisdictions for determining legislative intent to immunize state agencies from local zoning laws).

**65.** *See* Laurie Reynolds, *The Judicial Role in Intergovernmental Disputes: The Case Against Balancing,* 71 MINN. L.REV. 611, 612–13 (1987). The Pennsylvania Supreme Court has adopted a fifth test, the "legislative intent" test, which provides that "legislative intent may be determined by a consideration, inter alia, of the consequences of a particular interpretation." *Commonwealth v. Ogontz Area Neighbors Ass'n,* 505 Pa. 614, 483 A.2d 448, 454 (1984). The parties have not addressed the merits of this test. We decline to adopt the legislative intent test because it appears to be a modified balancing of interests test but with less guidance as to the factors to be considered.

**66.** J. Scott MacBeth, *Zoning and Planning: The Economics of State Land Use and the Balancing of Interests Test,* 30 WASHBURN L.J. 148, 151 (1990).

court will resort to rules of statutory construction to determine whether one's regulations should govern the other.[67] In a case like this one, where a local authority seeks to regulate a state instrumentality, the superior sovereign test presumes that the legislature intended the state instrumentality to be immune.

Under the eminent domain test, if a state agency has the power of eminent domain, it is immune from local zoning regulations.[68] The theory behind this test is that the power of eminent domain is inherently superior to the exercise of the zoning power [69] and thus there is a presumption that the legislature intended the state or its agency to be immune from local zoning laws if it granted that entity the power of eminent domain.[70]

Whether the legislature is deemed to have intended a governmental entity to be immune from local laws under the governmental function test depends on the purpose of the intended land use: If a use furthers a private purpose, as opposed to a governmental function, there is no immunity.[71] A proprietary land use is said to be one "conferring private advantage pursuant to permissive legislation" [72] or a function "undertaken by a governmental entity in a business, private, or corporate capacity." [73] In contrast, a governmental function has been characterized as a

"political function or as a function mandated by statute and performed by the governmental entity in furtherance of its duty to discharge its obligation for the health, safety and general welfare of the public." [74] Under this test, "[a] municipal corporation in the exercise of a governmental function is not subject to zoning laws or ordinances either within or outside the municipal boundaries." [75] This test was developed as a judicial response to the breadth of the superior sovereign and eminent domain tests by limiting immunity to governmental functions,[76] and it evolved in the context of governmental immunity from tort claims.[77] Although many courts have abandoned the governmental function test, a few continue to apply it.[78]

█ All three of these older tests have been heavily criticized because they have led courts to "frequently resolve[ ] such [intergovernmental] conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation." [79] In particular, critics of the superior sovereign test urged upon us by the Railroad and relied upon by the dissent cite defects such as "the test's lack of safeguards against irresponsibility, the practical difficulties inherent in develop-

---

67. *City of Richmond v. Bd. of Supervisors,* 199 Va. 679, 101 S.E.2d 641, 646 (1958).

68. MacBeth, *supra* note 66, at 152. For a survey of cases in which the courts have applied the eminent domain test, *see* Tomko–DeLuca, *supra* note 64, at § 22.

69. Note, *Governmental Immunity from Local Zoning Ordinances,* 84 Harv. L.Rev. 869, 874 (1971).

70. MacBeth, *supra* note 66, at 152.

71. *City of Albuquerque v. Jackson Bros., Inc.,* 113 N.M. 149, 823 P.2d 949, 951 (App.1991) (citing 6 Patrick J. Rohan, Zoning and Land Use Controls § 40.03[2](a) (1978)).

72. Note, *Municipal Power to Regulate Building Construction and Land Use by Other State Agencies,* 49 Minn. L.Rev. 284, 295–96 (1964).

73. Tomko–DeLuca, *supra* note 64, at § 2[a].

74. *Id.*

75. 8 Eugene McQuillin, Municipal Corporations § 25.15, at 55–56 (West Group ed., 3d ed.2002) (citations omitted).

76. Reynolds, *supra* note 65, at 621.

77. MacBeth, *supra* note 66, at 153.

78. Tomko–DeLuca, *supra* note 64, at §§ 10–1; *see also, e.g., Town of Bourne v. Plante,* 429 Mass. 329, 708 N.E.2d 103, 105 (1999); *Lane v. Zoning Bd. of Adjustment,* 669 So.2d 958, 959 (Ala.Civ. App.1995).

79. *Rutgers, the State University v. Piluso,* 60 N.J. 142, 286 A.2d 697, 701 (1972); *see also* 4 Sandra M. Stevenson, Antieau's Local Gov't Law § 57.08[3], at p. 57–107 (2d ed. 2002) (calling balancing of interests "more realistic than other tests" such as the governmental function test); Note, *supra* note 69, at 872 ("Inconsistent results proliferate due largely to state court reliance upon artificial labels to rationalize 'governmental immunity' from local zoning ordinances....").

ing a system of sovereign ranking, the inconsistencies in the test's application, the inability of the test to deal with conflicts between governmental units of equal rank, and the test's failure to recognize that all units of local government are 'equally' agents of the state." [80] Courts and commentators also have criticized the governmental function test as being difficult to apply and as requiring an often-tenuous distinction between governmental and proprietary functions. [81] We agree that these three traditional tests are unduly rigid and we join the growing ranks of jurisdictions who have rejected these tests in favor of the balancing of interests test.

■ In *Rutgers, the State University v. Piluso*, the New Jersey Supreme Court recognized that the scope of immunity may be limited, and that its scope is best determined by applying a "balancing of the interests" test. [82] The burden is on the governmental entity that seeks exemption from local zoning laws to prove that a balancing of the following factors weigh in favor of immunity: [83]

"the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests." [84] The court noted the importance of the flexibility of this test, [85] and emphasized that even where the balance tips in favor of immunity, "it must not . . . be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests." [86]

Some form of a balancing of interests test has been embraced in at least fourteen jurisdictions: Delaware, Florida, Indiana, Iowa, Kansas, Minnesota, Missouri, New Jersey, New York, North Dakota, Ohio, Oklahoma, Rhode Island, and South Dakota. [87] Others have approved it in dicta. [88] A few other states, while not explicitly adopting balancing tests, resolve such conflicts by assessing the necessity for the state's action, [89] or the reasonableness of the state's exercise of immuni-

**80.** Reynolds, *supra* note 65, at 619–20 (citations omitted); *see also Blackstone Park Improvement Ass'n*, 448 A.2d at 1238; MacBeth, *supra* note 66, at 152.

**81.** *See, e.g., Township of Washington v. Village of Ridgewood*, 26 N.J. 578, 141 A.2d 308, 311 (1958); 2 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING § 12.05, at 507–11 (4th ed. 1996).

**82.** 60 N.J. 142, 286 A.2d 697, 702–03 (1972).

**83.** *City of Crown Point v. Lake County*, 510 N.E.2d 684, 690 (Ind.1987) ("We conclude that an intruding entity must be allowed to seek relief under some circumstances. It must, however, bear the burden to show that immunity is necessary to advance the governmental ends it seeks."); *City of Fargo v. Harwood Township*, 256 N.W.2d 694, 698 (N.D.1977); *Temple Terrace*, 322 So.2d at 579.

**84.** *Piluso*, 286 A.2d at 702.

**85.** *Id.* at 703 ("[T]here is no precise formula or set of criteria which will determine every case mechanically and automatically.").

**86.** *Id.*

**87.** *See City of Washington v. Warren County*, 899 S.W.2d 863, 865–66 (Mo.1995); *Herrmann v. Bd. of County Comm'rs*, 246 Kan. 152, 785 P.2d 1003, 1008 (1990); *In re County of Monroe*, 72

N.Y.2d 338, 533 N.Y.S.2d 702, 530 N.E.2d 202, 203 (1988); *Hayward v. Gaston*, 542 A.2d 760, 766 (Del.1988); *City of Crown Point v. Lake County*, 510 N.E.2d 684, 690 (Ind.1987); *City of Ames v. Story County*, 392 N.W.2d 145, 149 (Iowa 1986); *Indep. Sch. Dist. No. 89 v. City of Oklahoma City*, 722 P.2d 1212, 1215 (Okla.1986); *Brownfield v. State*, 63 Ohio St.2d 282, 407 N.E.2d 1365, 1368 (1980), *overruled on other grounds by Racing Guild of Ohio v. Ohio State Racing Comm'n*, 28 Ohio St.3d 317, 503 N.E.2d 1025 (1986); *Blackstone Park Improvement Ass'n v. State Bd. of Standards & Appeals*, 448 A.2d 1233, 1239 (R.I.1982); *City of Fargo v. Harwood Township*, 256 N.W.2d 694, 698 (N.D.1977); *Lincoln County v. Johnson*, 257 N.W.2d 453, 458 (S.D.1977); *Hillsborough Ass'n for Retarded Citizens, Inc. v. City of Temple Terrace*, 332 So.2d 610, 612 (Fla.1976), *aff'g Temple Terrace*, 322 So.2d at 578–79; *Town of Oronoco v. City of Rochester*, 293 Minn. 468, 197 N.W.2d 426, 429 (1972); *Rutgers, the State University v. Piluso*, 60 N.J. 142, 286 A.2d 697, 701 (1972); *see also Dearden v. City of Detroit*, 403 Mich. 257, 269 N.W.2d 139, 142 & n. 4 (1978) (adopting "legislative intent" test, citing *Piluso* favorably).

**88.** *Hagfeldt v. City of Bozeman*, 231 Mont. 417, 757 P.2d 753, 757 (1988); *Kunimoto v. Kawakami*, 56 Haw. 582, 545 P.2d 684, 687 (1976).

**89.** *City of New Orleans v. Bd. of Comm'rs*, 640 So.2d 237, 252 (La.1994).

ty,[90] or of the zoning ordinance,[91] tasks that may easily turn into a balancing of interests. A similar balancing methodology has been endorsed by the drafters of the American Law Institute Model Land Development Code.[92]

■ We join those courts, adopting the factors as articulated by the New Jersey Supreme Court. Resort to the balancing of interests test is limited by two threshold requirements. First, because the test aims to discern legislative intent, direct statutory grants of immunity control when they exist.[93] Second, the court will not resolve conflicts under the balancing test unless the state has made a reasonable good faith attempt to comply with local zoning laws.[94] This second requirement is consistent with the premise that "the basic purpose of the doctrine of exhaustion of administrative remedies is 'to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.'"[95] Requiring the Railroad to first attempt to comply with Anchorage's zoning procedures enhances the possibility that the parties will reach an accommodation that serves the public interest underlying both the zoning power and the Railroad's quarrying activity without resorting to judicial remedies.[96] Because the Railroad has not yet sought the conditional use permit required by the Anchorage zoning

ordinance, neither this court nor the superior court should yet apply the balancing of interests test. If the Railroad continues to want to operate the quarry, it should apply for a conditional use permit from the Municipality. If the result of that application is unsatisfactory to it (or any other interested party), further proceedings may follow.

The balancing of interests test has been criticized by the Pennsylvania Supreme Court as amounting to "judicial legislation" because it yields uncertain results and requires courts to resolve intergovernmental land use disputes where the legislature is silent.[97] The eminent domain test, the superior sovereign test, and the governmental function test admittedly may provide a more clear-cut resolution to intergovernmental zoning disputes in some cases. But the very fact that the balancing of interests test does not yield highly predictable results, coupled with the requirement that the state first attempt to comply with local zoning laws, may promote good faith attempts at accommodation by the parties and minimize the need for judicial intervention.[98]

We conclude that the balancing of interests test represents the most enlightened approach to determining the legislature's intent with regard to the applicability of local zoning laws to state agencies. We agree with the Minnesota Supreme Court that "[t]he trend is to limit [the state's] freedom from

**90.** *Austin Indep. Sch. Dist. v. City of Sunset Valley*, 502 S.W.2d 670, 674 (Tex.1973).

**91.** *City of Everett v. Snohomish County*, 112 Wash.2d 433, 772 P.2d 992, 997–98 (1989).

**92.** *See* MODEL LAND DEV.CODE §§ 7–301 to 304 and 12–201 (1975).

**93.** *See Temple Terrace*, 322 So.2d at 579; *see also Brownfield*, 407 N.E.2d at 1368; *City of Fargo*, 256 N.W.2d at 698; *Young, supra* note 81, at § 12.05.

**94.** *See Piluso*, 286 A.2d at 703; *see also City of Crown Point* 510 N.E.2d at 690–91; *Brownfield*, 407 N.E.2d at 1368; *Temple Terrace*, 322 So.2d at 579.

**95.** *Mount Juneau Enters., Inc. v. City & Borough of Juneau*, 923 P.2d 768, 776–77 (Alaska 1996)

(quoting *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119, 122 (Alaska 1988)).

**96.** *Cf. Ben Lomond*, 761 P.2d at 122 ("[S]uccessful pursuit of a claim through the administrative process could obviate the need for judicial review of the constitutional issues."); Gregory W. Stype, Comment, *Government Immunity from Local Zoning Restrictions: The Balancing Test of Brownfield v. State*, 43 OHIO ST. L.J. 229, 241 (1982).

**97.** *Ogontz Area Neighbors Ass'n*, 483 A.2d at 454–55.

**98.** *See Brown v. Kansas Forestry, Fish & Game Comm'n*, 2 Kan.App.2d 102, 576 P.2d 230, 236 (1978) ("[I]f the state were not required to seek local approval, the city would always be forced to litigate its disagreement ....") (quoting *Hillsborough Ass'n for Retarded Citizens, Inc. v. City of*

regulation, a trend which we believe is well within the dictates of the public interest, principally because the pungent realities of urban sprawl and overpopulation have accentuated the need for land-use planning and control." [99] In adopting the balancing of interests test, we join the ranks of American jurisdictions that have rejected the formalistic approaches of the traditional tests. [100]

### C. The Interstate Commerce Commission Termination Act Does Not Preempt Local Zoning Regulation of the Railroad's Operations at the Eklutna Quarry.

The Railroad argues that Anchorage may not force it to obtain a conditional use permit for the quarry because the federal Interstate Commerce Commission Termination Act (ICCTA) [101] preempts Anchorage's zoning ordinances with respect to Railroad property. "ICCTA abolished the Interstate Commerce Commission, created the [Surface Transportation Board], and granted the board jurisdiction over certain interstate rail functions and proceedings." [102] Section 10501 of ICCTA provides, in pertinent part:

(b) The jurisdiction of the [Surface Transportation] Board over—

. . . .

(2) the construction, acquisition, *operation*, abandonment, or discontinuance of

spur, industrial, team, switching, or side tracks, or *facilities*, even if the tracks are located ... entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law. [103]

Eklutna argues that case law in other jurisdictions and the legislative history of ICCTA indicate that the act preempts only state economic regulation, and does not disturb local zoning authority. In determining the scope of federal preemption, "we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " [104] " '[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case." [105] Thus, we will evaluate the regulation the Municipality wishes to apply in order to determine whether it "st[ands] as an obstacle to the goals of ICCTA." [106]

In passing ICCTA, Congress focused on "removing *direct* economic regulation by the *States*." [107] One House Report, for example, noted that state criminal and antitrust law would not be preempted as applied to railroads, "because they do not generally collide with the scheme of economic regulation ... of rail transportation." [108]

---

*Temple Terrace*, 332 So.2d 610, 612 n. 3 (Fla. 1976)); Stype, *supra* note 96, at 264.

**99.** *Town of Oronoco*, 197 N.W.2d at 429.

**100.** Our decision today is also consistent with an opinion letter of the Alaska Attorney General, advocating for the adoption of the balancing of interests test in 1981. *See Rabbit Creek Shooting Range Improvement*, 1981 Informal Op. Att'y Gen. 867, 869; WL 38706, at *2 (Alaska, July 13, 1981).

**101.** 49 U.S.C. § 701 *et seq.* ICCTA applies to the Railroad via 45 U.S.C. § 1207(a)(1), which provides that " the [Alaska R]ailroad shall be a rail carrier engaged in interstate and foreign commerce subject to Part A of subtitle IV of Title 49 and all other Acts applicable to rail carriers subject to that chapter."

**102.** *City of Auburn v. United States*, 154 F.3d 1025, 1028 n. 3 (9th Cir.1998) (quoting ICC Termination Act of 1995, Pub.L. No. 104–88, 109

Stat. 803 (1995)), *cert. denied*, 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d 771 (1999).

**103.** 49 U.S.C. § 10501 (emphasis added).

**104.** *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

**105.** *Id.* (quoting *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)).

**106.** *In re Vermont Ry.*, 171 Vt. 496, 503 769 A.2d 648 (2001).

**107.** *Florida East Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1337 (11th Cir. 2001).

**108.** H.R. Rep 104–422, at 167 (1995), *reprinted in* 1995 U.S.C.C.A.N. 850, 852.

Similarly, another report contrasts the states' retained "police powers" to the exclusive "[f]ederal scheme of economic regulation and deregulation." [109] Congress's focus on economic regulation makes clear that it had no intention of preempting all state or local regulation that touches railroads in any way. Instead, "there are areas with respect to railroad activity that are reasonably within the local authorities' jurisdiction." [110] These areas are defined not by the subject matter of the regulation—we will not draw a line between "economic" and "environmental" or "land use" regulations.[111] Congress did not intend ICCTA to preempt state or local regulation with only "a remote or incidental effect on rail transportation." [112] State or local regulation of "manufacturing activities and facilities not integrally related to the provision of interstate rail service are not subject . . . to federal preemption." [113] The Surface Transportation Board has provided examples of allowable regulations, including "a local law prohibiting the railroad from dumping excavated earth into local waterways," or a law penalizing the railroad if "harmful substances were discharged during railroad construction." [114]

If Anchorage's zoning ordinance survives preemption, it will at least delay the operation of the quarry by the time needed for the Railroad to obtain a conditional use permit, and may bar the Railroad's use of the land altogether, if the permit is denied. Whether this amounts to undue interference with the Railroad's operation is a "fact-bound determination." [115] Although obtaining ballast for the Railroad's tracks arguably is "integrally related" to its operations, the Railroad's own operation of a gravel quarry is not. Thomas

E. Brooks, Chief of Engineering Services for the Railroad, testified at the evidentiary hearing that the Railroad generally obtains ballast by "request[ing] material from commercial sources outside the railroad or ask[ing] contractors to come into the pit that we operate." Brooks's affidavit indicates that rock from the Eklutna Quarry is a superior quality granite and provides a particularly economical source for ballast. It does not, however, establish that the economic impact of obtaining ballast from other sources would be so significant that it would necessarily interfere with rail operations. Brooks testified that if the Railroad is enjoined from obtaining ballast from Eklutna, it could get ballast from another source, as it did for eighty-two years prior to the quarry's opening.

 ICCTA's preemption is aimed at improving the "nationwide efficiency of the railroad industry," not at stopping all regulation that "prevents an individual firm from maximizing its profits." [116] Local regulation may bring some hardship or inconvenience to a railroad without causing the sort of economic impact that would trigger preemption. Therefore, on the record before us, the Railroad has not shown that Anchorage's zoning ordinance will have a more than incidental impact on its operations; the ordinance is therefore not preempted by ICCTA.

## IV. CONCLUSION

We REVERSE the order of the superior court entering judgment in favor of the Railroad. If the Railroad does not succeed in obtaining the necessary permit from the zon-

---

109. H.R. Rep. 104–311, at 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 807–08.

110. *Cities of Auburn and Kent, WA*, STB Finance Docket No. 33200, at *6 (Surface Transp. Bd. July 1, 1997); 1997 WL 362017.

111. *Cf. City of Auburn*, 154 F.3d at 1031 (noting that environmental regulations "will in fact amount to 'economic regulation' if the [rail] carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line").

112. *Florida East Coast Ry.*, 266 F.3d at 1331; *see also Borough of Riverdale*, STB Finance Docket No. 33466, at *5, (Surface.Transp.Bd. Sept. 9,

1999); 1999 WL 715272 ("[S]tate or local regulation is permissible where it does not interfere with interstate rail operations. . . .").

113. *Borough of Riverdale*, 1999 WL 715272, at *7.

114. *Cities of Auburn and Kent*, 1997 WL 362017, at *6.

115. *In re Vermont Ry.*, 171 Vt. at 502, 769 A.2d 648.

116. *Florida East Coast Ry.*, 266 F.3d at 1338 n. 11.

ing commission, it may seek judicial review in the superior court. The superior court will then apply the balancing of interests test, consistent with this opinion, to determine whether the legislature intended the Railroad to be immune from local zoning laws.

MATTHEWS, Justice, with whom BRYNER, Justice, joins, dissenting.

The question presented in this case is whether the state-owned Alaska Railroad is subject to municipal zoning ordinances. In my opinion the answer is no. In Alaska, state government activities are exempt from local regulation in the absence of a statute making them subject to local regulation. No statute makes the Railroad subject to local regulation. Therefore, the Railroad is exempt. Although this rationale is, in my opinion, conclusive and fully sufficient to decide this case, there is another reason why the Railroad is exempt: the legislature in passing the Alaska Railroad Corporation Act indicated its intention to exempt the Railroad from local zoning regulation. I address each of these reasons in this opinion.

I. **Alaska State Government Activities Are Exempt from Local Regulation in the Absence of a Statute Subjecting Them to Local Regulation.**

The traditional view is that state agencies are immune from municipal zoning in the absence of a statute making them subject to municipal zoning.[1] As the following discussion of the history of AS 35.30.020 and .030 will make clear, the Alaska Legislature has accepted this rule in enacting these statutory sections and their precursors. I start with these sections as they appear now. Alaska Statute 35.30.020 provides:

A department shall comply with local planning and zoning ordinances and other regulations in the same manner and to the same extent as other landowners.

Alaska Statute 35.30.030 provides:

If a department clearly demonstrates an overriding state interest, waiver of local planning authority approval and the compliance requirement may be granted by the governor. The governor shall issue specific findings giving reasons for granting any waiver under this section.

There are two other sections in AS 35.30. Both of them are helpful in understanding AS 35.30.020 and .030. Alaska Statute 35.30.010 provides:

(a) Except as provided in (b) of this section, before commencing construction of a public project,

(1) if the project is located in a municipality, the department shall submit the plans for the project to the planning commission of the municipality for review and approval;

(2) if the project is located within two miles of a village, the department shall submit the plans to the village council for review and comment;

(3) if the project is located within one-half mile of the boundary of an area represented by a community council established by municipal charter or ordinance, the department shall submit the plans to the community council for review and comment.

(b) Prior approval by a municipal planning commission may not be required before the commencement of construction of a highway or local service road if

(1) the department and the municipality have entered into agreement for the planning of the project under AS 19.20.060 or 19.20.070 and the plans for the project are completed in accordance with the terms of that agreement;

(2) the municipality has adopted a municipal master highway plan under AS 19.20.080 and the highway or local service road is consistent with the plan adopted; or

(3) the department has entered into agreement with the municipality for the planning of transportation corridors under AS 19.20.015 and the plans for the project are completed in accordance with the provisions of that agreement.

(c) If final disapproval by resolution of the governing body of the affected municipality or village is not received within 90

1. *See* 6 ROHAN, ZONING AND LAND USE CONTROLS § 40.03[1][b] at 40–122 (1993).

days from the date the project was submitted to the municipality or village, the department may proceed with the project.

The other section is AS 35.30.040. It provides:

In this chapter

(1) "public project" means a public building or other structure, public work, or other facility, highway, or local service road constructed or maintained by a department; the term includes the acquisition by purchase or agreement of land and rights in land for materials and the extraction or removal of materials necessary for completion of a highway under AS 19.05.080–19.05.120;

(2) "village" means an unincorporated community of the unorganized borough where at least 25 people reside as a social unit.

The definitions section of Title 35 is also important. Alaska Statute 35.95.100(3) provides:

In this title, unless the context requires otherwise,

. . .

(3) "department" means the Department of Transportation and Public Facilities[.]

The substance of present day AS 35.30.020 and 35.30.030 were first enacted in 1975. Chapter 96, section 1, SLA 1975. The features now found separately in sections .020 and .030, the duty of compliance and waiver of compliance, were both incorporated in a single section, AS 35.10.020. As it was enacted in 1975, this section read:

Before the construction of a public works in a municipality, the department shall confer with the planning commission of the municipality to determine that the welfare of the public is properly protected and its agencies and instrumentalities shall comply with all local planning and zoning ordinances and the local regulations in the same manner and to the same extent as

other landowners. However, if a state agency clearly demonstrates an overriding state interest, a waiver to the compliance requirements may be granted by the governor.

The history of the 1975 version of AS 35.10.020 began in 1957. Chapter 152 Laws of Alaska 1957, Title III, article 3, section 2, required the Department of Transportation and Public Facilities' territorial predecessor, the Alaska Highway and Public Works Board, to confer prior to the construction of any public work within a municipality "with the planning commission of such municipality to determine that the welfare of the public is properly protected." There was no requirement that the board also comply with local planning and zoning ordinances, only that it confer.

A change with respect to local building codes took place in 1968. Chapter 89, section 1, SLA 1968, was enacted requiring compliance with local building codes, but not local zoning ordinances. The 1968 enactment was codified as AS 35.10.025. As enacted it read, and still reads, as follows:

A public building shall be built in accordance with applicable local building codes including the obtaining of required permits. This section applies to all buildings of the state and corporate authorities of the state.[2]

An important change was made to AS 35.10.020 in 1974.[3] Previously, as noted, the highway board, and after statehood, the department, had to confer with local authorities to determine that the welfare of the public was properly protected prior to going forward with construction in a municipality. In 1974 an additional requirement was imposed relating to compliance with zoning ordinances. Under the new requirement, uses of property sold or leased by the state to other than a public entity had to comply with local zoning ordinances as long as the property was "held in private use." In full, as amended in 1974, AS 35.10.020 provided:

---

**2.** Note that although this section is in Title 35, which mainly relates to the Department of Transportation and Public Facilities, its application extends beyond the department to all state entities.

**3.** Ch. 63, § 1, SLA 1974.

Before the construction of a public works in a municipality, the department shall confer with the planning commission of the municipality to determine that the welfare of the public is properly protected. *Real property of the state which is leased, sold, exchanged, or otherwise transferred for value to other than a public entity shall conform so long as held in private use to local planning and zoning ordinances* and regulations in the same manner and to the same extent as real property of other landowners subject to the local ordinances and regulations, unless the local ordinances and regulations are less stringent than comparable state standards.

(Emphasis added.)

Having described the history of AS 35.10.020 thus far, it is worthwhile to ask whether a reasonable argument could be made in light of AS 35.10.020 as it existed in 1974 that projects on state land that remained in state hands were required to comply with local planning and zoning ordinances. The answer is clear that they were not. The unmistakable meaning of section .020 as of the 1974 amendment is that while projects on state land that had been transferred for private use were required to conform with local zoning ordinances "so long as held in private use," projects on state land not held in private use did not have to conform to local zoning requirements. The 1974 amendment clearly illustrates the rule that state projects are exempt from local zoning unless a statute provides otherwise.

As described above, in 1975 AS 35.10.020 was amended again. Instead of being limited to state property that had been trans-

ferred for private use, the requirement of compliance with local planning and zoning ordinances subject to a waiver granted by the governor was made generally applicable.

In 1976 another change was made that again illustrates legislative acceptance of the rule of general immunity. In 1976 the University of Alaska was made subject to AS 35.10.020.[4] As amended in 1976 the statute had the familiar form of the 1975 act requiring both a conference with local officials and compliance with local ordinances, with the latter subject to gubernatorial waiver. The statute read:

Before the construction of a public works in a municipality, or a building or other structure by the University of Alaska in a municipality, the department or the University of Alaska, as appropriate, shall confer with the planning commission of the municipality to determine that the welfare of the public is properly protected. The University of Alaska or the department and its agencies and instrumentalities shall comply with all local planning and zoning ordinances and the local regulations in the same manner and to the same extent as other landowners. However, if a state agency or the University of Alaska clearly demonstrates an overriding state interest, a waiver to the compliance requirements may be granted by the governor.

The University was added to the coverage of AS 35.10.020 because it took the position that it did not have to comply with local planning and zoning ordinances and the legislature thought it was desirable that the University be required to so comply.[5]

---

4. Ch. 50, § 1, SLA 1976.

5. Senator Chancy Croft, sponsor of the measure, explained the purpose of the amendment as follows to the Community and Regional Affairs Committee of the Senate:

Mr. Chairman, you will recall that last year we passed a bill that contained all this except for the reference to the University of Alaska. None of us I think being sensitive enough that the University considers itself something other than a portion of the state as far as public works are concerned. The bill as far as I know was satisfactory to everybody with the exception that the University told people that they just weren't going to abide by it. I think

they should and if I frankly had had any knowledge that they wouldn't, we would have included it last year and this bill simply adds the University to the bill that was passed last year that requires state instrumentalities to comply with local planning and zoning ordinances unless the governor determines that there is a sufficient reason to override it in which he case he can do it but otherwise they have to abide by the same laws as everybody else.

Track 1, 16:00–19:20—1976 Senate Committee: Community & Regional Affairs.

When the legislation was being considered by the House of Representatives, Senator Croft explained the evolution of the requirement of state

The rule that state government entities are not subject to local zoning in the absence of a statute is illustrated by the 1976 amendment. The University had taken the position that it was not subject to zoning because no statute provided that it was subject to zoning. The legislature implicitly accepted the University's view that it was not subject to zoning but decided that as a policy matter that the University should be subject to zoning and amended AS 35.10.020 to include the University.

Nothing occurred to indicate that the legislature had altered the general rule of immunity in 1984 when the legislature enacted the Alaska Railroad Corporation Act.[6] As a part of that act, AS 42.40.920 specifically provided that Title 35 of the Alaska Statutes would not apply to the Railroad. Thus AS 35.30.020 and .030 do not apply to the Railroad. This exemption put the Railroad in the position that the University had been in prior to the 1976 amendment, and in the position that all state projects had been in prior to the 1975 amendment—immune from local planning and zoning ordinances.

Having stated this conclusion, I do not mean to imply that no changes were made between 1976 and 1984 to AS 35.30.020 and .030. There was a change in 1977, but it did nothing to erode the principle that state agencies do not have to comply with local zoning unless required by statute. The change is interesting because it laid the groundwork for a broadening in the coverage of AS 35.30.020.

In 1977, AS 35.30.020 as it had existed was broken into two parts, with .020 requiring compliance with local planning ordinances and .030 providing for a waiver by the governor. Other changes were also made. Instead of referring to "the department" as previously, .020 was written in its present form referring to "a department." Likewise, the waiver provisions put in .030 referred to "a department."

In the definitions section of the 1977 enactment, AS 35.30.040(1) stated: "In this chapter (1) 'department' means the Department of Transportation and Public Facilities, and the University of Alaska." But this was changed in 1987. Alaska Statute 35.30.040(1) was repealed.[7] This was the section that defined the "department" in the 1977 act to include the University of Alaska. Did this mean that the 1987 legislature no longer intended the University of Alaska to be subject to local zoning ordinances? Or did it mean that the legislature believed that without the definition the University would be covered because it is "a department"? It is clear that no substantive change was intended. The changes were described by the title of the act as merely "corrective amendments to the Alaska Statutes as recommended by the revisor of statutes." In a memorandum dated May 17, 1987, the revisor wrote that section AS 35.30.040(1) was "proposed for repeal" because the definition of "department" was "redundant to a definition in AS 35.25.020 that applies to all of AS 35."[8] In the same memo the revisor refers to section 57, among other sections, as a section that "repeal[s] provisions that are duplicated by

---

government compliance with local codes as follows:

> This, I might say Mr. Chairman, this whole area has been one in which the state has gone on a gradual basis to it. The first portion of the bill of the present statute that the state would consult was passed in 57 and then it was 68 before the state said that it would comply with local building codes. And then in 75 we went and we thought we were picking up the University but there was a drafting mistake and we weren't, that they shall comply with local planning and zoning, and so it has been a real evolutionary process....

Track 2, 0:27–4:00—1976 House Committee: Community & Regional Affairs.

The hearing concluded with Representative Cotton and Senator Croft agreeing that another look should be taken in the future to determine whether the statute was still insufficiently comprehensive. Representative Cotton stated: "It was pointed out to me at one time that public works was somewhat restrictive and really didn't take everything that a lot of people would like to have seen into consideration." Senator Croft responded: "I think that's a valid point and sure would be glad to work on that."

6. AS 42.40.010–.990.

7. Ch. 14, § 57, SLA 1987.

8. House Journal Supp. No. 11 at 8, 1987 House Journal 1617.

other applicable law, and make[s] conforming changes in related provisions." [9] Since the 1987 amendment disclaims any intent to make a substantive change, it seems that the revisor interpreted "a department" in AS 35.30.020 and .030 to include all departments of state government, including the University of Alaska. Otherwise the change would have been substantive, deleting the University from coverage of the statute. As the legislature enacted the change suggested by the revisor, the legislature endorsed the revisor's view.

It thus appears that AS 35.30.020 and .030 now include all departments of state government that are not excluded by other statutes. But this interpretation is not central to the main premise of this dissent, which is simply that the evolution of .020 and .030 plainly shows that the legislature has accepted the traditional rule that state entities that are not made subject to local zoning by statute are not subject to local zoning.[10]

In summary, the history related above shows that state entities and state activities not covered by .020 and .030 and their predecessors were assumed and intended by the legislature to be immune from local zoning. Acceptance of the rule of immunity is clearly shown in 1974 when state lands conveyed or leased to private entities were made subject to local zoning so long as they remained in private hands, but state lands not meeting these conditions remained immune from local zoning. It is also clearly shown in 1976 when the legislature included the University in the coverage of .020 because the University was not originally included and it was thought desirable to make the University comply with local zoning. Nothing occurred in the intervening years between the 1974, 1975, and 1976 enactments and 1984 to change the rule of general state immunity. Thus when the legislature enacted the Alaska Railroad Cor-

poration Act and exempted the Railroad from coverage by .020 and .030, the Railroad retained the immunity from local zoning that it had as an instrumentality of the federal government because no statute made it subject to local zoning.

## II. The Alaska Railroad Corporation Act Exempts the Railroad from Local Zoning.

Although the rationale that state agencies are immune from local zoning unless a statute makes them subject to local zoning expressed above is sufficient to decide this case, there are a number of provisions in the Alaska Railroad Corporation Act that affirmatively indicate that the Railroad was intended to be exempt from local planning and zoning control. These include:

### a. AS 42.40.390.

This section provides:

The board may adopt exclusive rules governing land use by parties having interests in or permits for land owned or managed by the corporation. The power conferred by this section is exercised for the common health, safety, and welfare of the public and to the extent constitutionally permissible, may not be limited by the terms and conditions of leases, contracts, or other transactions.

By this section the Railroad Board is given the power to "to adopt exclusive rules governing land use" for railroad land. The second sentence of this section confirms that the exclusive rules have the same purpose as a planning and zoning ordinance, namely to provide "for the common health, safety, and welfare of the public." The word "exclusive" by definition excludes the possibility that a municipality could impose rules governing land use of railroad property.

---

9. *Id.* at 2.

10. There are a number of particularized statutes that also indicate the legislature's acceptance of the rule that state agencies and state activities should be immune from local zoning unless made subject to zoning by statute. Thus AS 18.55.100(7) makes the Alaska Housing Finance Corporation subject to local zoning. If the corporation were already subject to local zoning this

act would not have been needed. Similarly, AS 19.30.080 provides that access roads to state land constructed within a municipality that has zoning shall conform with zoning regulations as to width of right-of-way—but, by implication, not with other standards. Likewise, AS 38.04.045 requires that the Department of Natural Resources when subdividing state land for sale within a municipality comply with local zoning.

The legislative history of this section of the Alaska Railroad Corporation Act confirms that the legislature was aware that section .390 placed railroad lands beyond the control of local zoning. Tamara Cook, Deputy Director of the Division of Legal Services of the Legislative Affairs Agency, first raised a question as to the effect of section .390 on March 1, 1984, at a Senate Transportation Committee meeting. She asked, "what does it do, is this an effort to supercede municipal land use regulations? Is that what this does? Does this say that property controlled by the railroad is not subject to municipal land regulations? Is that what this is?" [11] Chairman Moss initially responded in the negative: "I don't believe that that was the original intent on it. Maybe, I'm wrong on it." But Cook persisted, stating: "What this says though, it says the board may adopt exclusive regulations governing land use, which means that the board would then be operating as a planning commission." After further discussion Cook again explained that the Railroad could "attempt to put a subdivision" on acquired property "and not be subject to municipal zoning ordinances." She recommended that "until this section is made a lot clearer I think the committee ought to consider dropping it entirely." Chairman Moss observed that this would be "one way to eliminate the problem." Senator Gilman agreed that "removing it is fine" but observed that as to a version of the legislation in a prior session there were reasons why the section was written as it was, but he could not remember what they were. He suggested that he be allowed to "revisit the file." Chairman Moss agreed: "Let's do that before we delete this section" and proceeded to adjourn the meeting.

Cook put her concerns in writing, in a memorandum dated March 12, 1984, to the Chair of the Senate Transportation Committee. Observing that there are two alternative effects of AS 42.40.390, she again recommended that section .390 be clarified or deleted:

> Section 42.40.390 appears to be an attempt to grant the power of land use regulation, such as platting and zoning, to the railroad corporation, which would contravene the requirement contained in Article X, section 2 that all local government powers shall be vested in boroughs and cities. If, on the other hand, the purpose of the section is to exclude rail property from municipal land use regulation, that should be done specifically. I would recommend that the section be clarified or eliminated.

It is worth noting that while Cook states that there are two possible interpretations of section .390—that it grants zoning power to the Railroad or that it excludes railroad property from municipal land use regulation—under either interpretation the Railroad would be immune from local zoning. Under the first, a grant of exclusive zoning power to the Railroad would necessarily exclude the power of a municipality to zone the same property. Under the second, the exclusion of municipal zoning is the explicit purpose.[12] Section .390 was retained as written, despite Cook's suggestion that it be clarified or deleted.

The question of retaining or deleting section .390 was taken up for the last time by the Senate Transportation Standing Committee on March 15, 1984. The minutes of that meeting indicate that Senator Gilman initially sought to remove AS 42.40.390. But Senator Halford responded "that there should be a way to protect railroad operations. That would protect the railroad's operations from

---

11. *See* Senate Transportation Committee Hearing, tape 65, side A, March 1, 1984.

12. Today's opinion offers a third interpretation of section .390. It states that the section "could also be read as a choice-of-law provision...." Slip Op. at 11. Thus, "if the Railroad Board promulgated rules conflicting with local ordinances, the Railroad's regulations would govern, but in the absence of a conflict, local rules are unaffected." Under this interpretation the Railroad Board may promulgate a land-use rule cov-

ering the land in question, permitting it to be used for quarry purposes. Since such a rule would conflict with the municipal zoning code, the rule would govern. Thus even under the court's interpretation, section .390 is a "direct statutory grant[ ] of immunity," Slip Op. at 27–30, albeit a conditional one, that controls over the balancing test adopted by today's opinion when the Railroad Board promulgates rules inconsistent with local zoning.

local zoning restrictions." [13] The matter was discussed further. Senator Gilman stated that .390 "originally was put in at a time when it was anticipated that they were going to have to establish some rationale for why the railroad should get a tax-exempt bonding authority." He noted that this was no longer a problem. But Senator Faiks stated that pending in the House of Representatives was a bill that would take away tax-exempt status from the Railroad. She argued that section .390 should be left in the bill. This was the final resolution.

The discussion reveals that the Senate Committee clearly understood that .390 would protect the Railroad's operations from local zoning restrictions. No one argued with Senator Halford's characterization that this was the section's direct function. Senator Gilman's observation that the purpose of section .390 was to guarantee tax-exempt bonding status is consistent with section .390's function. In order to have tax-exempt bonding status, it was believed that the Railroad needed land use regulation powers comparable to those of a local government. Such powers were granted. It does not matter whether the powers were granted primarily so that the Railroad could issue tax-free bonds or so that the Railroad would not be disturbed in its operations by municipal zoning. Whatever the dominant motive may have been, the grant of exclusive land use regulatory power was the same.

**13.** Minutes of Committee Meeting of March 15, 1984.

**14.** AS 42.40.935(b) provides:

> No later than two years after the date of transfer, the corporation in consultation with the Department of Public Safety and appropriate municipal officials, shall develop and adopt a plan to achieve compliance with building and related safety codes applicable to facilities of the corporation. The plan shall be implemented and compliance achieved within five years after it is adopted. In the sole determination of the commissioner of public safety, any existing building owned or controlled by the corporation that does not present a serious safety hazard and for which compliance would be uneconomical in consideration of its remaining useful life shall be exempted from compliance with state or municipal safety codes.

### b. AS 42.40.920(b)(3).

This is the section that declares that AS 35 does not apply to the Railroad. Since, as discussed above, AS 35 contains AS 35.30.020 requiring "a department" to comply with local zoning, exempting the Railroad from AS 35 indicates, among other purposes, an intent to exempt the Railroad from local zoning.

### c. AS 42.40.935(b). [14]

This section required the Railroad to comply with local building and safety codes within five years, subject to waiver by the Commissioner of Public Safety. Because AS 35 is not applicable to the Railroad, AS 35.10.025, [15] which requires all public buildings to comply with local building codes, did not apply to the Railroad. Recognizing that a transition to compliance with local building codes was desirable, subject to an executive waiver, the legislature enacted AS 42.40.936(b). Its enactment shows legislative awareness that in light of the fact that AS 35 was made inapplicable to the Railroad, special measures were needed in areas where it was intended to make the Railroad subject to local laws. The omission of a similar measure relating to compliance with local zoning codes thus seems deliberate and purposeful.

### d. AS 42.40.250(13). [16]

Section .250 lists the general powers of the Alaska Railroad Corporation. Subsection (13) authorizes the Railroad Corporation to

**15.** *See supra* p. 59.

**16.** AS 42.40.250 provides in relevant part:

> In addition to the exercise of other powers authorized by law, the corporation may
>
> . . .
>
> (9) contract with and accept transfers, gifts, grants, or loans of funds or property from the United States and the state or its political subdivisions, subject to other provisions of federal or state law or municipal ordinances;
>
> . . .
>
> (13) apply to the state, the United States, and foreign countries or other proper agencies for the permits, licenses, rights-of-way, or approvals necessary to construct, maintain, and operate transportation and related services, and obtain, hold, and reuse the licenses and permits in the same manner as other railroad operators[.]

apply to various entities for permits or approvals necessary to construct various facilities. The Railroad is authorized to apply to the "state, the United States, and foreign countries or other proper agencies." But the list pointedly does not include political subdivisions of the state. By contrast, subsection (9) of section .250 expressly mentions political subdivisions. Subsection (13) thus suggests that the legislature thought that it would not be necessary for the Railroad to apply to political subdivisions for approval to obtain permits to construct and operate facilities.

The legislative history of subsection (13) indicates that the omission of political subdivisions was not accidental. Versions of the Alaska Railroad Corporation Act were considered in 1982. Senate Bill 212 in 1982 contained a section entitled "Licenses and Permits." It provided:

> Whenever the laws of a municipality, the state, or the United States require a license or a permit to undertake certain activities or perform an act, the authority, prior to undertaking the activity or performing the act, shall comply therewith to the same extent as the state, except as otherwise provided in this chapter.

A notation in the legislative folio indicates that the Railroad requested that the word "municipality" be deleted from this provision. Offered as a reason for this was that "the railroad presently negotiates with a number of municipalities regarding crossings, traffic signals, etc. If the municipalities were granted authority to regulate the railroad's passage through their boundaries, the railroad's transportation of goods and services would be so erratic as to be totally nonoperable." [17]

The specific examples offered by the Railroad, "crossings, traffic signals, etc.," may not be subjects governed by typical zoning codes, but the more general topic of "passage through municipal boundaries" potentially is. Further, the bill applied to all permits "to undertake certain activities or perform an act," terms that readily encompass permits

such as conditional use permits needed for zoning compliance. If the legislature intended the Railroad to be subject to local zoning codes—regulatory systems in which permits of many types are standard fare—it would not have deleted political subdivisions from the list of government entities to which the Railroad is authorized to apply for permits.

In summary, the legislature in section .390 of the Alaska Railroad Corporation Act gave the board exclusive authority to adopt rules governing railroad land. This necessarily excluded local zoning authority over the same land. The Legislative Affairs Agency and a legislative committee recognized that section .390 had this effect. A number of other provisions of the Alaska Railroad Corporation Act confirm that the legislature intended that the Railroad was to be exempt from local zoning.

### III. Conclusion

The traditional rule that state entities are not subject to local zoning unless a statute so provides has been repeatedly recognized by the Alaska Legislature. The Alaska Railroad is exempt from local zoning under this rule because no statute makes it subject to zoning. In addition, provisions of the Alaska Railroad Corporation Act show that the legislature intended the Alaska Railroad Corporation to be exempt from local zoning.

For these reasons, I dissent.

---

**17.** April 12, 1982 Memorandum from Senator Kerttula to the Senate Transportation Committee outlining the amendments to SB 212 requested by Frank Jones, the manager of the Alaska Railroad.