CITY OF BELTON, Missouri,
Respondent,

v.

SMOKY HILL RAILWAY &
HISTORICAL SOCIETY,
INC., Appellant.

No. WD 64131.

Missouri Court of Appeals,
Western District.

May 17, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 2, 2005.

As Modified Aug. 2, 2005.

Application for Transfer Denied
Sept. 20, 2005.

William N. Marshall III, Kansas City, MO, for respondent.

Daniel L. Fowler and Victor B. Peters, Kansas City, MO, for appellant.

Before SPINDEN, P.J., and HOWARD and NEWTON, JJ.

VICTOR C. HOWARD, Judge.

Appellant Smoky Hill Railway & Historical Society, Inc. ("Smoky Hill"), appeals from a conviction in the Circuit Court of Cass County for nine municipal ordinance violations in the Respondent City of Belton ("Belton"). Smoky Hill argues three points on appeal. In Point I, Smoky Hill argues the trial court erred in finding Smoky Hill guilty of violating Belton's ordinances, because the ordinances are invalid as applied to Smoky Hill, in that regulation of railroads by local authorities is preempted by the Interstate Commerce Commission Termination Act of 1995. In Point II, Smoky Hill argues the trial court erred in finding Smoky Hill guilty of violating Belton's ordinances, because the application of subsequently enacted zoning ordinances to Smoky Hill's pre-existing right-of-way is an unconstitutional taking of private property without compensation or due process. In Point III, Smoky Hill argues the trial court erred in finding Smoky Hill guilty of violating Belton's occupational licensing codes, because the codes are invalid as applied to Smoky Hill, in that Belton exceeded the jurisdiction granted by statute to fourth-class cities by licensing, regulating and taxing a railroad. For the following reasons, we affirm the judgment of the trial court.

### Background

Burlington Northern Railway formerly owned and operated approximately five miles of railroad track that runs through Belton. Burlington Northern ceased operations on those tracks in the late 1970's or early 1980's and officially abandoned its use of the line in 1988. The railroad tracks were not used again until Smoky Hill purchased the line in 1991. The north end of the line owned by Smoky Hill is physically joined with the Kansas City Southern Railway through a device known

as a removable derail, which prohibits either entity from operating over the tracks of the other. The removable derail is operated by Kansas City Southern Railway. Kansas City Southern Railway has no trackage rights over Smoky Hill's line. Kansas City Southern Railway is also not insured to operate trains on Smoky Hill's railroad tracks.

Smoky Hill's tracks cross active public highways, specifically Highway 58 and Y Highway. Smoky Hill crosses other streets and has active signals at some crossings. Smoky Hill is inspected by the Federal Railroad Administration ("FRA") for compliance with federal railroad laws and regulations. The FRA inspects the rails, ties, crossing signals, rail cars, facilities, locomotives, and the cars that operate as a museum. The FRA oversees every aspect of the railroad, including the historical side of the museum and the railroad operations. Smoky Hill is required to submit reports to the FRA and is subject to violations and fines if it does not submit reports. Smoky Hill is also inspected and regulated by the Missouri Department of Transportation.

Smoky Hill's primary business is to operate an "excursion" or "tourist" railroad. The excursion railroad is powered by a diesel locomotive and has a top speed of ten miles per hour. Witnesses for both parties testified that they never observed the excursion railroad travel north of downtown Belton or toward the north end of the line that connects with Kansas City Southern. Smoky Hill also engaged in the ancillary business of storing freight cars. Smoky Hill stored the freight cars on tracks in areas that have been zoned as commercial and residential areas. Some of the freight cars were defaced with graffiti, and some freight cars had their doors standing open.

Belton charged Smoky Hill with nine violations of Belton zoning ordinances: (1) leasing tracks for the purpose of storing freight cars in a commercial area on November 5, 2002, in violation of Article 2, Section 6B of the zoning ordinance; (2) leasing tracks for the purpose of storing freight cars in a residential area on November 5, 2002, in violation of Article 2, Section 2B of the zoning ordinance; (3) allowing freight cars to remain on the tracks with open doors and bearing graffiti markings on November 5, 2002, in violation of Section 16-3(2) of the municipal code; (4) conducting business other than the type of business listed on the occupational license (operating a storage facility when limited to operating a demonstration museum railroad) on November 5, 2002, in violation of Section 12-10 of the municipal code; (5) leasing tracks for the purpose of storing nineteen freight cars in a residential area on April 10, 2003, in violation of Article 2, Section 2B of the zoning ordinance; (6) operating a business other than the type of business listed on the occupational license on April 10, 2003, in violation of Section 12-10 of the municipal code; (7) operating a business other than the type of business listed on the occupational license on April 16, 2003, in violation of Section 12-10 of the municipal code; (8) leasing tracks for the purpose of storing nineteen freight cars in a residential area on April 16, 2003, in violation of Article 2, Section 2B of the zoning ordinance; and (9) leasing tracks for the purpose of storing nineteen freight cars in a residential area on April 24, 2003, in violation of Article 2, Section 2B of the zoning ordinance.

Smoky Hill moved to dismiss the charges, and the motion to dismiss was overruled on February 13, 2004. All nine violations were consolidated for trial on April 16, 2004. Following a bench trial, the trial court found Smoky Hill guilty of all nine violations and sentenced Smoky

Hill to pay fines totaling $3,250. This appeal follows.

## Standard of Review

Belton and Smoky Hill agree that this appeal concerns statutory interpretation, which is an issue of law. Therefore, we review *de novo*. *Barker v. Barker*, 98 S.W.3d 532, 534 (Mo. banc 2003).

## Point I

■ In Point I, Smoky Hill argues the trial court erred in finding Smoky Hill guilty of violating Belton's ordinances, because the ordinances are invalid as applied to Smoky Hill, in that regulation of railroads by local authorities is preempted by the Interstate Commerce Commission Termination Act of 1995.

The Interstate Commerce Commission Termination Act of 1995 (ICCTA) provides, in relevant part, at 49 U.S.C. § 10501:

(a)(1) Subject to this chapter, the [Surface Transportation] Board has jurisdiction over transportation by rail carrier that is—

(A) only by railroad; or

(B) by railroad or water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

(2) Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in—

(A) a State and a place in the same or another State as part of the *interstate rail network*;

. . . .

(b) The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, inter-change, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

(Emphasis added.)

In support of Point I, Smoky Hill argues that the ICCTA preempts local zoning ordinances. Smoky Hill claims that a city cannot apply its local zoning ordinances to property used for railroad operations because these regulations could be used to defeat a railroad's maintenance and upgrading activities and could interfere with the operational and economic efficiency of railroad operations in interstate commerce. Smoky Hill argues that it operates in interstate commerce because (1) it is a Kansas corporation that operates in Missouri as a foreign corporation; (2) Smoky Hill's railroad cars came from other states; and (3) some of the passengers for its excursion trains come from other states. According to Smoky Hill, each of the local ordinances it was convicted of violating are preempted as applied to Smoky Hill because Smoky Hill is a railroad and the ordinances in question operate to regulate its railroad activities. Smoky Hill claims to be a railroad over which the Surface Transportation Board has exclusive jurisdiction under 49 U.S.C. § 10501(b), because its track is physically connected with the track of the Kansas City Southern Railway, its track is the same gauge as most railroads across the United States,

and it is connected to the general system of railroads of the United States. Smoky Hill also argues that while its primary business is to operate an excursion train, another part of its business is the storage of freight cars, and it is a common business practice for excursion railroads to lease property for freight car storage.

Smoky Hill argues that by enforcing these ordinances, Belton dictates where rail cars are stored, the condition in which they are stored and the business a railroad can conduct. Smoky Hill claims that all of these areas are related to railroad operations and the use of yards, tracks, and other facilities. Smoky Hill also argues that nuisance ordinances may not be used to interfere with railroad operations. Smoky Hill claims that in order to comply with the Belton municipal code, it would have to re-paint, sandblast, or cover railroad cars that it does not own.

■■■ Although a court's analysis of the scope of a federal preemption statute must begin with its text, "interpretation of that language does not occur in a contextual vacuum. Rather, that interpretation is informed by two presumptions about the nature of preemption." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996). First, it is presumed that states' historic police powers are not preempted unless it is the clear intent of Congress. *Id.* Second, a court's analysis of the scope of a statute's preemption is determined by the congressional purpose in enacting the statute. *Id.* at 485–86, 116 S.Ct. at 2250. Congressional purpose in determining the scope of a preemption statute is "revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* at 486, 116 S.Ct. at 2251.

■■■ Courts have limited the preemptive sweep of the ICCTA in many instances. "As for the limits imposed by the commerce clause, it is well-established that Congress may regulate intrastate rail traffic *where that traffic substantially affects interstate commerce by virtue of its being part of an interstate rail network.*" *Ill. Commerce Comm'n v. Interstate Commerce Comm'n*, 749 F.2d 875, 886 (D.C.Cir.1984) (emphasis added). "Congress did not intend ICCTA to preempt state or local regulation with only a remote or incidental effect on rail transportation." *Native Vill. of Eklutna v. Alaska R.R. Corp.*, 87 P.3d 41, 57 (Alaska 2004) (quotation and citations omitted). "Local regulation may bring some hardship or inconvenience to a railroad without causing the sort of economic impact that would trigger preemption." *Id.* The ICCTA does not preempt all state and local regulations with any economic impact on rail operations. *In re Vermont Ry.*, 171 Vt. 496, 769 A.2d 648, 654 (2000). *Fla. East Coast Ry. v. City of West Palm Beach*, 266 F.3d 1324, 1338 n. 11 (11th Cir.2001), provides:

> In reducing the regulation to which railroads are subject at state and federal levels, the ICCTA concerns itself with the efficiency of the industry as a whole across the nation. *See* 49 U.S.C. § 10101 (1994 & Supp.1998). No statement of purpose for the ICCTA, whether in the statute itself or in the major legislative history, suggests that any action which prevents an individual firm from maximizing its profits is to be preempted.

"Allowing localities to enforce their ordinances with the possible incidental effects such laws may have on railroads would not result in the feared 'balkanization' of the railroad industry as companies sought to comply with those laws." *Id.* at 1339.

In its operation as a tourist excursion railroad that runs exclusively on five miles of track, Smoky Hill is not part of the "interstate rail network" under 49 U.S.C. § 10501(a)(2)(A). The application of Belton's municipal codes and zoning ordinances to Smoky Hill is not inconsistent with the congressional intent for ICCTA to promote the efficiency of the interstate rail network, and does not hinder interstate commerce in any meaningful way. Although the FRA inspects Smoky Hill to ensure compliance with grade crossing and accident reporting regulations, Smoky Hill is not part of the interstate rail network for which local ordinances are preempted under 49 U.S.C. § 10501(b).

In *Branson Scenic Railway v. Director of Revenue*, 3 S.W.3d 788, 790 (Mo.App. W.D.1999), a tourist railroad that traveled over trackage in both Arkansas and Missouri sought a state sales tax refund on the grounds that its ticket sales were interstate commerce and exempt from the tax. *Branson Scenic* provides that "[w]hen a carrier offers rides for fun, as opposed to offering them for the purpose of actually getting the rider to a particular place, then the carrier is providing amusement rides. It is not in the transportation business, even though its mode of amusement is mobile." *Id.* at 792. *Branson Scenic* affirmed the administrative decision to reject the railway's claim for a sales tax refund. *Id.*

Smoky Hill is similar to the railroad in *Branson Scenic* in that it offers rides for amusement rather than providing transportation between destinations. Therefore, Smoky Hill is not in the transportation business and is not a part of the interstate rail network for which the ICCTA, at least partially, preempts local regulation.

The fact that Smoky Hill leases part of its property to a third party for the storage of rail cars does not overcome the presumption that Belton can appropriately exercise its police powers to regulate this ancillary use. Belton's enforcement of guidelines for the health, safety and welfare of its citizens in this instance does not frustrate federal regulation of the interstate railroad industry in spite of Smoky Hill's unsubstantiated claim of a potential and peripheral effect on rail transportation.

Point I is denied.

## Point II

■ In Point II, Smoky Hill argues the trial court erred in finding Smoky Hill guilty of violating Belton's ordinances because the application of subsequently enacted zoning ordinances to Smoky Hill's pre-existing right-of-way is an unconstitutional taking of private property without compensation or due process.

In support of Point II, Smoky Hill argues that it is a violation of the Missouri Constitution for a zoning ordinance to prohibit a use of land that pre-existed the ordinance. Smoky Hill claims that, while Belton first adopted its zoning ordinance in 1974, the evidence established that the land was used for a railroad as early as 1918. According to Smoky Hill, in 1918, the area where it currently stores freight cars was outside of the Belton city limits. Smoky Hill claims that the railroad tracks have been in their present form for at least forty years and have not been removed during that time, and, while Burlington Northern sought to abandon its own rail service on the tracks, it did not seek to abandon all rail service or have the right-of-way abandoned. Smoky Hill cites a 1988 ICC Certificate and Decision in support of its claim that it was clearly contemplated by Belton, Smoky Hill, and Burlington Northern that Smoky Hill would continue to provide rail service, including

freight service if needed. Smoky Hill argues that the only change approved by ICC was Burlington Northern's cessation of service. Smoky Hill concludes that its right of way is exempt from Belton's zoning ordinances because the use of the land as a railroad preceded both the presence of Belton in the area where the violations occurred and preceded the adoption of any Belton zoning ordinances.

Article 7, Section D of the Belton Zoning Ordinance provides, in relevant part:

(8) Abandonment or Discontinuance:

When a nonconforming use is discontinued or abandoned, for a period of twelve (12) consecutive months, such use shall not thereafter be re-established or resumed, and any subsequent use or occupancy of such land shall comply with the regulations of the zoning district in which such land is located.

In the instant case, the evidence was that Burlington Northern's use of the tracks was discontinued in the late 1970's or early 1980's and did not resume until 1991, when Smoky Hill began operations as a tourist railroad. Under the plain language of the zoning ordinance, use of the tracks for freight car storage was a non-conforming use that was discontinued for a period of at least twelve months. Therefore, Smoky Hill's use and occupancy of the tracks must comply with the regulations of the zoning district. Smoky Hill's argument that Burlington Northern intended for Smoky Hill to continue to provide rail service and did not seek to abandon the right-of-way is irrelevant, because the intent to continue a non-conforming use is not a factor in determining whether a discontinued non-conforming use is permitted.

In support of Point II, Smoky Hill cites *Missouri Rock, Inc. v. Winholtz*, 614 S.W.2d 734, 739 (Mo.App. W.D.1981), which provides that "[z]oning ordinances must permit continuation of non-conforming uses in existence at the time of enactment. . . . If a zoning regulation does not expressly exempt existing uses, the regulation will be construed as having only prospective effect to preserve the order from invalidity." In *Winholtz*, Clay County enacted a zoning ordinance that would have restricted a mining operation that was in existence at the time of enactment. *Id.* at 737. *Winholtz* held that "open cut mining by Missouri Rock on the subject land is, *so long as continued in original form*, a nonconforming use exempt from regulation by the amended zoning order of Clay County." *Id.* at 739 (emphasis added). Smoky Hill also cites *Odegard Outdoor Advertising, LLC v. Board of Zoning Adjustment of Jackson County*, 6 S.W.3d 148, 150 (Mo. banc 1999), which held that billboards were exempt from compliance with a zoning ordinance enacted after the billboards were established.

The instant case is distinguishable from *Winholtz* and *Odegard*. In *Winholtz* and *Odegard*, the non-conforming uses were never discontinued subsequent to the enactment of the zoning ordinances. By contrast, the use of the railroad tracks in the instant case was discontinued for several years after the enactment of the Belton zoning ordinance. *Winholtz* and *Odegard* allowed non-conforming uses, provided that they were continuing uses. In this case, Smoky Hill seeks to continue a non-conforming use that was discontinued for longer than the Belton zoning ordinance permits. Because the use of the tracks was discontinued for more than twelve months, Smoky Hill must comply with all applicable zoning ordinances.

Point II is denied.

## Point III

In Point III, Smoky Hill argues the trial court erred in finding Smoky Hill

guilty of violating Belton's occupational licensing codes, because the codes are invalid as applied to Smoky Hill, in that Belton exceeded the jurisdiction granted by statute to fourth-class cities by licensing, regulating, and taxing a railroad.

In support of Point III, Smoky Hill argues a municipality's power to regulate businesses and issue licenses is derived from section 94.270,[1] and absent a specific grant of power by the state, the city has no such power because it is a creature of the legislature and has only the power specifically delegated to it by the legislature. Smoky Hill argues that because section 94.270 does not specifically grant a municipality the power to tax or regulate railroads, Smoky Hill is exempt from Belton's occupational licensing ordinance. Smoky Hill claims that because its occupational license states that it is a "demonstration museum railroad," it should be considered a railroad for the purpose of section 94.270. Smoky Hill concludes that the state has not given municipalities the power to regulate railroads, and, therefore, Belton may not enforce its municipal ordinances against Smoky Hill.

Section 94.270 provides, in relevant part, that "[t]he mayor and board of aldermen shall have power and authority to regulate and to license and to levy and collect a license tax on .... museums."

In the instant case, Belton is not attempting to regulate Smoky Hill as a railroad but rather as a museum. Smoky Hill has obtained an occupational license to do business as a "demonstration museum railroad," and Belton does have authority under section 94.270 to regulate museums. Although freight car storage may be in the ordinary business of a railroad, it is not in the ordinary business of a museum. Although section 94.270 does not allow fourth-class cities to regulate railroads, Smoky Hill has an occupational license to operate as a museum, and, therefore, it must comply with Belton's occupation license ordinances.

Point III is denied.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

SPINDEN, P.J., and NEWTON, J., concur.

---

1. Statutory references are to Revised Statutes of Missouri 2000, unless otherwise indicated.