VILLAGE OF SILVER LAKE, APPELLANT, *v.* METRO REGIONAL
TRANSIT AUTHORITY ET AL., APPELLEES.

[Cite as *Silver Lake v. Metro Regional Transit
Auth.*, 111 Ohio St.3d 324, 2006-Ohio-5790.]

(No. 2005–1074—Submitted March 15, 2006—Decided November 22, 2006.)

O'DONNELL, J.

{¶ 1} The village of Silver Lake appeals from a decision of the Summit County Court of Appeals, which reversed the judgment of the trial court and authorized the Metro Regional Transit Authority to lease the Akron Secondary railroad track which borders Silver Lake, to a subsidiary of the Adrian & Blissfield Railroad, known as the Cuyahoga Falls & Hudson Railway Company, for the operation of a dinner-excursion train. For the reasons that follow, we affirm that decision.

{¶ 2} In 1972, the cities of Akron, Barberton, and Cuyahoga Falls each passed ordinances creating the Metro Regional Transit Authority for the purposes of preserving and maintaining the existing level of mass transit service in the area and providing the administrative and financial capability to upgrade that service in the future. In 1995, using funds from the Federal Transit Administration and the Ohio Department of Transportation, Metro purchased the tracks and right-of-way known as the Akron Secondary, from milepost 8.0 in Cuyahoga Falls north to milepost 1.45 in Hudson, from the Consolidated Rail Corporation. One and one-half miles of that track are located along the western border of Silver Lake and run parallel to State Route 8. Eight-tenths of a mile adjoin 33 homes in the village. In 2002, the Adrian & Blissfield Railroad contacted Metro regarding the possibility of operating a dinner-excursion train on the Akron Secondary. Metro invited public bidding for the venture and ultimately accepted a proposal submitted by the Cuyahoga Falls & Hudson Railway Company. Metro then leased the track and right-of-way to the Cuyahoga Falls & Hudson Railway for a period of five years for the operation of the dinner train.

{¶ 3} The proposed dinner train was initially to consist of two dining cars, a kitchen car, and two locomotives, with passengers departing from and returning to Cuyahoga Falls. The parties anticipated the excursion train to be a revenue-

producing project for Metro. In addition, pursuant to the terms of the lease, Cuyahoga Falls & Hudson Railway Company agreed to maintain and improve the railroad infrastructure.

{¶ 4} As a result of the proposed dinner train, the village of Silver Lake sued Metro in the Summit County Common Pleas Court to enjoin it from leasing the Akron Secondary, asserting that its zoning code does not permit the operation of a railroad for a commercial use and urging that a dinner-excursion train is not a transit facility. The village timely sought a judgment declaring that Metro lacked the statutory authority to lease its facilities to operate a dinner train. The trial court granted Silver Lake's request for both injunctive and declaratory relief, and found both that there was an "imminent threat" that the proposed dinner train would violate the Silver Lake zoning code and that the dinner train did not fit the definition of a transit facility; it therefore held that the lease exceeded the scope of Metro's statutory authority.

{¶ 5} On appeal, the Summit County Court of Appeals reversed the trial court, determining that because the Akron Secondary had been excluded from any zoning designation in the Silver Lake zoning code, the dinner train would not violate any zoning code restrictions. It further held that Metro had the statutory authority to lease the Akron Secondary regardless of whether the dinner train itself was a transit facility. Silver Lake appealed to our court, and we granted discretionary review on the limited question of Metro's statutory authority to lease the Akron Secondary. *Silver Lake v. Metro Regional Transit Auth.*, 106 Ohio St.3d 1532, 2005-Ohio-5146, 835 N.E.2d 382.

{¶ 6} Silver Lake asserts in our court that Metro exceeded its statutory authority in leasing the Akron Secondary to the Cuyahoga Falls & Hudson Railway Company to operate a dinner-excursion train, contending that a regional transit authority is confined to utilizing its property only for an activity in which the primary purpose is the regularly scheduled mass movement of passengers.

{¶ 7} Metro, on the other hand, argues that the law permits a regional transit authority to lease transit facilities to accomplish the purposes of its organization and that the law authorizes a regional transit authority to lease real property to protect and improve its transit facilities or for any other necessary purpose. Therefore, Metro claims, it leased the Akron Secondary for the dinner-excursion train in accordance with its statutory authority, not only to generate revenue for Metro but also to obligate the railway to assume responsibility for the maintenance and improvement of the Akron Secondary until Metro can engage in the regularly scheduled mass movement of passengers on that line.

{¶ 8} The issue then presented for our review concerns the scope of the statutory authority of a regional transit authority, specifically, whether the Metro Regional Transit Authority is authorized to lease the Akron Secondary to the

Cuyahoga Falls & Hudson Railway Company on an interim basis for the operation of a dinner train until Metro can use the tracks for the mass movement of passengers, or whether Metro is restricted to leasing property that is only being utilized as a transit facility.

{¶ 9} A transit facility is defined in R.C. 306.30: "As used in sections 306.30 to 306.53, inclusive, of the Revised Code, 'transit facility' means any:

{¶ 10} "(A) Street railway * * * or other ground * * * transportation system having as its primary purpose the regularly scheduled mass movement of passengers between locations within the territorial boundaries of a regional transit authority, including all right-of-way * * * attendant thereto * * *."

{¶ 11} Also relevant to this issue, however, are subsections (G) and (J) of R.C. 306.35, which provide additional statutory authorization for a regional transit authority to lease transit facilities or to lease real property. Specifically, R.C. 306.35 provides:

{¶ 12} "Upon the creation of a regional transit authority * * *, the authority shall exercise in its own name all the rights, powers, and duties vested in and conferred upon it by sections 306.30 to 306.53 of the Revised Code. Subject to any reservations, limitations, and qualifications that are set forth in those sections, the regional transit authority:

{¶ 13} "* * *

{¶ 14} "(G) May acquire, construct, improve, extend, repair, lease, operate, maintain, or manage transit facilities within or without its territorial boundaries, considered necessary to accomplish the purposes of its organization and make charges for the use of transit facilities;

{¶ 15} "* * *

{¶ 16} "(J) *May* * * * *lease* as lessee or lessor * * * *real and personal property,* or any interest or right in real and personal property, * * * *for* the location or *protection of transit facilities* and *improvements and access* to transit facilities * * * *or for any other necessary purpose* * * *." (Emphasis added.)

{¶ 17} These foregoing subsections require no judicial interpretation: "When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for this court to apply the rules of statutory interpretation." *Symmes Twp. Bd. of Trustees v. Smyth* (2000), 87 Ohio St.3d 549, 553, 721 N.E.2d 1057. "Statutory interpretation involves an examination of the words used by the legislature in a statute, and when the General Assembly has plainly and unambiguously conveyed its legislative intent, there is nothing for a court to interpret or construe, and therefore, the court applies the law as written." *State v. Kreischer,* 109 Ohio St.3d 391, 2006-Ohio-2706, 848 N.E.2d 496.

{¶ 18} Thus, two bases exist that authorize the Metro Regional Transit Authority to lease the Akron Secondary to the Cuyahoga Falls & Hudson Railway Company for the operation of a dinner train. First, assuming that the Akron Secondary, consisting of a railroad right-of-way and six and one-half miles of railroad track, is a transit facility, Metro is authorized to lease it while it is being held for future use. Second, Metro is authorized to lease the Akron Secondary because it is owned by Metro and it consists of real property that may be leased for the protection of or improvement and access to transit facilities, or for any other necessary purpose.

## R.C. 306.35(G): Lease of Transit Facilities

{¶ 19} Consistent with R.C. 306.35(G), a regional transit authority is authorized to acquire or lease transit facilities "considered necessary to accomplish the purposes of its organization." The ordinances of Akron, Barberton, and Cuyahoga Falls that created the Metro Regional Transit Authority set forth its purposes: to preserve and maintain the current level of mass transit service and to provide the administrative and financial capability to improve and upgrade mass transit service in the future.

{¶ 20} In addition, the Ohio Department of Transportation provided partial funding for Metro's purchase of the Akron Secondary to further the Department's commitment to secure feasible transportation options for the future. The Department believed that retaining Conrail's Akron–to–Hudson rail line for future rail freight, passenger, and commuter service is one action consistent with that goal. Further, Federal Transit Administration policies also encourage transit systems to participate in joint development projects, including leases of real property "to secure a revenue stream for the transit system" while the property is held for a future use. Federal Transit Administration Policy on Transit Joint Development, 62 F.R. 12266–01. Therefore, although the Akron Secondary is not currently used by Metro for the regularly scheduled mass movement of passengers, it nonetheless constitutes a transit facility, as it is a rail line acquired with federal and state funds to preserve a potential future commuter rail line. Metro is thus authorized to lease the tracks to accomplish the goals of its organization, and the dinner-train lease will not only generate revenue for Metro but will also obligate the lessee, the Cuyahoga Falls & Hudson Railway Company, to maintain and improve the Akron Secondary.

## R.C. 306.35(J): Lease of Real Property

{¶ 21} Even if the Akron Secondary is not considered to be a transit facility, the Metro Regional Transit Authority is nonetheless authorized to lease it because it is real property consisting of a railroad right-of-way and a rail line. The plain language of R.C. 306.35(J) authorizes Metro to lease the Akron

Secondary for the protection of or improvement and access to transit facilities or for any other necessary purpose. The terms of the dinner-train lease provide that the Cuyahoga Falls & Hudson Railway Company will maintain and improve the rail line, and the anticipated revenue from the lease will provide the financial capability to improve transit facilities in the future.

## Conclusion

{¶ 22} Where a regional transit authority acquires an existing rail line and right-of-way, R.C. 306.35(G) and (J) independently confer upon it the discretion to lease the rail line and right-of-way while it is being held for future use to accomplish the purposes of its organization, to make charges for the use of transit facilities, for the protection of or improvement and access to transit facilities, or for any other necessary purpose.

{¶ 23} Here, the Metro Regional Transit Authority leased the Akron Secondary to the Cuyahoga Falls & Hudson Railway Company for the operation of a dinner train in accordance with this statutory authority. Therefore, we are compelled to affirm the judgment of the court of appeals.

Judgment affirmed.

PFEIFER, LUNDBERG STRATTON and LANZINGER, JJ., concur.

MOYER, C.J., RESNICK and O'CONNOR, JJ., dissent.

---

**O'CONNOR, J., dissenting.**

{¶ 24} R.C. Chapter 306 governs the creation and authority of regional transit authorities, including the appellee, Metro Regional Transit Authority. As creatures of statute, regional transit authorities may exercise only those powers that are expressly granted or that may be reasonably inferred from an express grant of authority. See *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health,* 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536; *Burger Brewing Co. v. Thomas* (1975), 42 Ohio St.2d 377, 71 O.O.2d 366, 329 N.E.2d 693. Implied powers are those that are incidental or ancillary to an expressly granted power; the express grant of power must be clear, and any doubt as to the extent of the grant must be resolved against it. *State ex rel. A. Bentley & Sons Co. v. Pierce* (1917), 96 Ohio St. 44, 47, 117 N.E. 6.

{¶ 25} Pursuant to R.C. 306.31, a regional transit authority may be created for the purpose of "acquiring, constructing, operating, maintaining, replacing, improving, and extending transit facilities" and for similar acts, such as controlling and administering the public utilities franchise of transit facilities; entering, supervising, and accepting the assignment of franchise agreements; and accept-

ing assignment of and exercising a right to purchase a transit system according to the terms of an existing franchise agreement. The General Assembly thus conferred some breadth upon the counties, townships, and municipalities to create regional transit authorities. Metro suggests that once a regional transit authority has been created, it can then act broadly to exercise an array of rights, including proprietary and contractual rights. But while some breadth of rights may be conferred in the creation of a regional transit authority, the exercise of the authority's power is not unlimited. Rather, any exercise of that power must be consistent with the purposes of the statute.

{¶ 26} Central to the understanding of R.C. 306.31 and other sections of R.C. Chapter 306 is the definition of "transit facility." The legislature expressly defined that term to mean a transportation system (e.g., a street railway, motor bus, subway, ferry, helicopter) that has "as its *primary purpose* the regularly scheduled *mass movement of passengers* between locations within the territorial boundaries of a regional transit authority." (Emphasis added.) R.C. 306.30(A). The General Assembly's definition thus expressly requires that a regional transit facility must have as its "fundamental" or "principal" act, see Webster's Third New International Dictionary (1986) 1800 (defining "primary"), the "chang[ing] of place," id. at 1480 (defining "movement"), of "a large body of persons in a compact body," id. at 1388 (defining "mass"). When Metro helps thousands of residents of Summit County get to work, school, appointments, and social events through its bus lines, it serves the transportation needs of the public and acts clearly as a "transit facility." Here, however, Metro is not operating such a service.

{¶ 27} The train at issue in this litigation clearly was not intended to provide the people of Summit County with a form of mass transit. Transportation, after all, necessarily involves the movement, conveyance, or travel of people and things from one place to another. *Branson Scenic Ry. v. Dir. of Revenue* (Mo.App. 1999), 3 S.W.3d 788, 791. See, also, *United States v. Mohrbacher* (C.A.9, 1999), 182 F.3d 1041, 1048–1049; *Golden Gate Scenic Steamship Lines, Inc. v. Pub. Util. Comm.* (1962), 57 Cal.2d 373, 380, 19 Cal.Rptr. 657, 369 P.2d 257, quoting *Gloucester Ferry Co. v. Pennsylvania* (1885), 114 U.S. 196, 5 S.Ct. 826, 29 L.Ed. 158 (noting that the word "transportation" "has been judicially defined as implying 'the taking up of persons or property at some point and putting them down at another' "). Mere mobility does not equate to transportation, particularly when, as here, the movement in question is limited to a circuital route. *Branson Scenic Ry.,* 3 S.W.3d at 792 ("Carousels, pony rides, riverboat rides, trail rides, miniature train rides, and the antique car ride at [an amusement park] * * * carry (transport) patrons * * * Yet, no one could argue persuasively that these rides were transportation rather than amusement").

{¶ 28} Nor is there any showing in this record that a significant number of people will ever ride the train. Indeed, we can infer that a relatively small number of passengers will be able to avail themselves of the train, which Metro stipulates will have limited (one or two) weekly runs and will consist, in its entirety, of two dining cars, a kitchen car, and two locomotives.

{¶ 29} Thus, we know that the train was intended neither for the masses nor for transportation. Nor is there any indication that it will foster the important public policies and benefits that are believed to flow from mass transit systems, such as providing commuting workers with a safe and reliable mode of transportation, decreasing motor vehicle traffic and concomitant harms to the environment caused by vehicle emissions, or improving domestic security by reducing dependence on foreign petroleum products.

{¶ 30} Indeed, although the majority opinion, Metro, and Metro's amici rather nebulously suggest that operation of the dinner train will help maintain and improve the railway tracks for future use as a passenger line, it seems abundantly clear that the real purpose of the proposed train is to produce revenue for Metro by attracting consumers interested in purchasing a meal and entertainment. I agree with the common pleas court that initially heard this case, as well as courts elsewhere in the country, that excursion trains operating for purposes of entertainment and profit are not instruments of mass transit. See, e.g., *Belton v. Smoky Hill Ry. & Historical Society, Inc.* (Mo.App.2005), 170 S.W.3d 429, 435, quoting *Branson Scenic Ry. v. Dir. of Revenue*, 3 S.W.3d at 792 (" '[w]hen a carrier offers rides for fun, as opposed to offering them for the purpose of actually getting the rider to a particular place, then the carrier is providing amusement rides. It is not in the transportation business, even though its mode of amusement is mobile' "). See, also, *Napa Valley Wine Train, Inc. Petition for Declaratory Order*, 7 I.C.C.2d 954, 965 (noting that a train operating on 18 miles of a railroad line in Napa Valley, California, was "more a local tourist excursion than a conveyance for the through movement of passengers").

{¶ 31} The majority's holding too generously reads beyond the express wording of the enabling statute, unreasonably extends the powers properly conferred on regional transit authorities, and ignores critical distinctions that courts and legislatures historically have drawn in considering passenger trains and excursion trains, see, e.g., *Chicago & Alton R.R. Co. v. People* (1883), 105 Ill. 657, to find that the proposed train adequately serves the fundamental purposes for which the Metro Regional Transit Authority was created initially—to preserve, maintain, and improve the current level of mass transit service of its constituents. Because I do not believe that there is a sufficient and reasonable showing of a tangible nexus between the proposed train and the regularly scheduled mass movement of passengers, I dissent.

MOYER, C.J., and RESNICK, J., concur in the foregoing dissenting opinion.

Mazanec, Raskin & Ryder Co., L.P.A., Todd M. Raskin, Timothy R. Obringer, and Martin J. O'Connell; and Hoover, Heydorn & Herrnstein Co., L.P.A., and Robert W. Heydorn, for appellant.

Roetzel & Andress, Amie L. Bruggeman, Stephen W. Funk, and Caroline Regallis, for appellee.

Lawrence Gawell, for amicus curiae Ohio Public Transit Association.

Max Rothal, Akron Director of Law, and David A. Muntean, Assistant Director of Law, for amicus curiae city of Akron.

Vorys, Sater, Seymour & Pease, L.L.P., Richard L. Moore, and Erica D. Gann, for amicus curiae Southwest Ohio Regional Transit Authority.

Barry M. Byron, Stephen L. Byron, and John Gotherman, for amicus curiae Ohio Municipal League.